FILED
United States Court of Appeals
Tenth Circuit

August 7, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

JACK R. YOUNGS, JAMES G.
CORELL, WILLIAM R. McDAVID,
AND MARGARET B. McDAVID,

     Plaintiffs-Appellees,

v.

AMERICAN NUTRITION, INC., JACK
BEHNKEN, NANCY BEHNKEN, JOHN
BEHNKEN, SANDI BEHNKEN, AND
WILLIAM BEHNKEN,

     Defendants-Appellants.

Nos. 06-4203, 06-4205, 06-4207,
06-4253, 06-4257, and 06-4266

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 1:04-CV-00183-PGC)

---

Robert M. Anderson (Jennifer A. Whitlock with him on the brief), of Van Cott, Bagley,
Cornwall & McCarthy, Salt Lake City, Utah, for Plaintiffs-Appellees.

Richard F. Ensor of Young, Hoffman, Strassberg & Ensor, LLP, Salt Lake City, Utah,
(Robert S. Clark and James Alhstrom of Parr Waddoups Brown Gee & Loveless, Salt
Lake City Utah and Brent O. Hatch and T. Parker Douglas of Hatch, James & Dodge,
P.C., Salt Lake City, Utah, with him on the brief), for Defendants-Appellants.

---

Before **LUCERO, HOLLOWAY** and **EBEL**, Circuit Judges.

---

**HOLLOWAY**, Circuit Judge.

These appeals by related parties are from an order confirming an arbitration award and a subsequent order awarding pre-judgment and post-judgment interest. Jurisdiction in the district court was based on diversity of citizenship. This court's jurisdiction is based on 28 U.S.C. § 1291.[1]

**I**

Appellants are the majority shareholders of the closely held corporation, American Nutrition, Inc. ("ANI"), and ANI itself. The majority shareholders are the members of the Behnken family – Jack and Nancy Behnken and their three adult children, William, Sandi, and John Behnken ("the Behnken siblings"). The Behnkens, directly or through other completely controlled corporate entities, own about 87% of the stock of ANI. The appellees are four of the five minority shareholders of ANI.

The primary underlying dispute between the majority and minority shareholders of ANI involves allegations that the majority usurped ANI's corporate opportunities and transferred ANI's assets to the detriment of the minority. Other companies owned by the Behnkens – Rocky Mountain Milling Company, Solar Engineering Ltd., and Behnken

---

[1]Three groups of defendants-appellants filed separate notices of appeal from the district court's order confirming the arbitration award. Then, after the district court ordered that interest be assessed on the award to the appellees and entered an amended judgment, they filed three more separate notices of appeal. The clerk entered an order consolidating the six appeals for procedural purposes, including briefing and submission. All of the appellants then joined in a single opening and single reply brief. We now consolidate these appeals for decision and disposition.

Properties – are involved in this dispute because they were the beneficiaries of the transactions that allegedly diminished the value of ANI and thus of the minority shares.[2]

In the early 1990s, all of ANI's real property was transferred to Behnken Properties and then leased back to ANI. The minority shareholders have alleged that they approved this transfer, which benefitted the Behnkens, only because they were promised a "day of fairness," by which they apparently meant that they were promised that they would be compensated for the diminution in value of their shares caused by this arrangement. But that never happened. Moreover, Jack Behnken allegedly caused ANI to pay higher lease rates to Behnken Properties than had been disclosed and approved.

Also in the 1990s, ANI's equipment was transferred to another Behnken family entity, Solar Engineering, and leased back. Allegedly ANI received less than the real value of the equipment in the sale, and the lease-back was at inflated rates. The low sales price and high lease-back costs were allegedly concealed from the minority shareholders.

ANI makes dry pet food. In 1997 and 1998, Jack Behnken allegedly caused profitable product lines (canned pet food and treats, primarily) to be transferred from ANI to yet another Behnken family entity, Rocky Mountain Milling Co. The minority shareholders alleged that in six years, this transfer of product lines resulted in Rocky Mountain Milling distributing over $26 million in profits to the Behnken family.

---

[2]We emphasize that we are summarizing the allegations made by the minority shareholders because their grievances were the impetus for the arbitration at issue. We do not imply agreement (or disagreement) with these allegations. We have not described the counter allegations made by the majority in response to the minority's allegations because they are unnecessary to our decision.

In an earlier effort to resolve this dispute, the parties agreed to mediation. After a day of efforts, they entered into a Memorandum of Understanding in which they agreed to a mechanism for valuing ANI and the minority's interest. The parties agreed that the "fair market enterprise value" of ANI would include Rocky Mountain Milling and Solar Engineering. They also agreed to continue mediation and to go to arbitration if mediation was unsuccessful. The Memorandum of Understanding recited that after an agreement was reached as to the value of the minority's interest, their stock would be bought at that price by the majority.

The Behnken parties terminated the Memorandum of Understanding before further settlement efforts, however. This led to the filing of the instant lawsuit in the district court, which was first filed by the minority shareholders as an action to enforce the Memorandum of Understanding and compel mediation or arbitration. The district court ruled, however, that the mediation had been properly terminated.

The parties then entered into the May 26, 2005 Arbitration Agreement under which the arbitration award now at issue was eventually made. Like the Memorandum of Understanding, the Arbitration Agreement contemplated an eventual buyout of the minority after the value of the minority's interest would have been determined. John Heald, who had been a director of ANI for some years, was named arbitrator, with all parties waiving any objection that he did not meet the American Arbitration Association's definition of a neutral arbitrator because of his history with the company and the parties. Proceedings in the district court were stayed on joint motion of the parties to permit the arbitration to go forward.

There were other disputes between the parties, or some of them at least, that were not directly related to ANI. Jack Youngs, the first named plaintiff/appellee, had other business dealings with Jack Behnken, and the Agreement recites that "controversies have also developed" between them regarding these other dealings, "which may include but not be limited to investment by each of them in entities or properties owned or controlled by the other." These other disputes are called the "Youngs/Behnken Controversy" in the Arbitration Agreement, which recites that Jack Youngs and Jack Behnken "desire to resolve" those matters in the arbitration procedure.

One of the issues raised on appeal by the majority shareholders is that the arbitrator failed to resolve the Youngs/Behnken Controversy. Thus, it is surprising that the majority's brief has nothing whatsoever to say about the content of the controversy. Our study of the record on the matter has not been very enlightening, a point to which we shall return. For now, we note only that appellants' appendix, which appears to contain all relevant material from the district court record, shows only a single document that was provided to the arbitrator that appears to relate to the Youngs/Behnken Controversy. It is a message from Jack Behnken to Jack Youngs, a copy of which was submitted to the arbitrator. IV Aplt. App. 1314. This document purports to summarize the outcome of the investments each of the two men made in ventures of the other. The document purports to show that three of five of Behnken's investments in Youngs' ventures resulted in losses to Behnken (the losses being substantially greater than the gains on the two profitable ventures), while Youngs' investments in Behnken's ventures all resulted in gains to Youngs. These matters date back

-5-

to 1978, according to the document, with Behnken's largest reported loss (some $422,000) coming on an investment dated 1981-1983. The document also purports to show that Behnken lost about $125,000 in an investment in the years 1987-1988, and another $102,000 that was invested in the years 1994, 1996 and 2001. The record reveals nothing as to the nature of Mr. Behnken's potential claims against Mr. Youngs arising from these investment losses.

The arbitrator ultimately set a value of just over $7.5 million for the minority's interest in ANI. The arbitrator gave a brief written explanation for the method of valuation. He stated that ANI and Rocky Mountain Milling Co. were "inseparable in all respects" and that he had therefore included the four-year average of the full earnings of both companies in his calculations. He also included the four-year average rental income of Behnken Properties in order to recognize "the value associated with the transfer of property and plant to Behnken [P]roperties."

The parties filed competing motions in the district court, the minority moving to confirm the award and the majority moving to vacate it. The district court granted the motion to confirm, but with one necessary modification of the arbitrator's award.[3] In a later order, the court granted pre-judgment and post-judgment interest to the plaintiff minority

---

[3]The arbitrator had included in his calculations the one-and-a-fraction per cent of the stock owned by the fifth minority shareholder, commenting that this minority shareholder "should receive payment at this time, if he chooses to do so." The fifth minority shareholder was not a party to the arbitration or the civil case. The district court simply modified the arbitrator's award to reflect that fact, reducing the amount to be paid for the interest of the plaintiff minority shareholders to some $6.7 million.

shareholders.

## II

### A

In the Arbitration Agreement, the parties stipulated to application of Utah law. On appeal, both parties cite to Utah law regarding the standard of review that this court should apply. We have found no significant differences between Utah law and federal law on the issues involved in this appeal. We thus have no occasion to grapple with questions about which law to apply, and we will cite to both state and federal authorities herein, assuming without deciding in each instance that it would make no difference if we were to consult state instead of federal law or vice-versa.[4] We note in this regard that the Utah Supreme Court looks to federal caselaw for guidance because of the "nearly identical" provisions of the Federal Arbitration Act, while reserving the option to adopt a different construction. *Buzas Baseball, Inc. v. Salt Lake Trappers, Inc.*, 925 P.2d 941, 947 n.5 (Utah 1996).

Under Utah law "judicial review of arbitration awards should not be pervasive in scope . . . but should be limited to the statutory grounds and procedures for review." *Buzas Baseball*, 925 P.2d at 947 (quoting *DeVore v. IHC Hospitals, Inc.*, 884 P.2d 1246, 1251 (Utah

---

[4]We faced a very similar situation in *Foster v. Turley*, where we noted the parties' stipulation for the application of state law in their contract; noted that some courts have held that, notwithstanding the parties' insertion of a choice-of-law provision in their agreement, the Federal Arbitration Act applies if the contract evidences a transaction involving interstate commerce[]"; and concluded that we need not decide which law governed because we saw no difference in state and federal law on the issues raised in the case. 808 F.2d 38, 41 (10th Cir. 1986). As to whether the contract in the instant case evidences a transaction involving interstate commerce, we need not and do not express an opinion; neither of the parties makes an argument on either side of the question.

1994)).  In general, a trial court should not disturb an arbitration award "because the court does not agree with the award as long as the proceeding was fair and honest and the substantial rights of the parties were respected." *Id.*

This is an extremely deferential standard.  But "very limited grounds" for modifying or vacating arbitration awards are recognized by the courts and embodied in the Utah Arbitration Act. *Id.*[5]  As possibly relevant here, a court may vacate an arbitration award under the Utah Arbitration Act only if it appears that "misconduct" by an arbitrator prejudiced the rights of a party to the proceeding, that the arbitrators exceeded their powers, or that the arbitrators otherwise conducted the hearing to the substantial prejudice of the rights of a party. Utah Code Ann. § 78-31a-124(1)(b),(c),(d).[6]  An arbitrator exceeds his powers if the award is "without foundation in reason or fact."  *Buzas Baseball*, 925 P.2d at 950 (quoting *Brotherhood of R.R. Trainmen v. Central of Ga. Ry.*, 415 F.2d 403, 411-12 (5th Cir. 1969)).

The burden is on the party seeking to vacate an arbitration award, which in this case is the majority shareholders, to show that one of the limited statutory grounds exists for setting aside the arbitration result. *See Ormsbee Development Co. v. Grace*, 668 F.2d 1140, 1147 (10th Cir. 1982).  That burden is very great. *Federated Department Stores v. J.V.B.*

---

[5]The statutory grounds set out in the Utah Arbitration Act for vacating an arbitration award are not identical with those of the Federal Arbitration Act. *See Buzas Baseball*, 925 P.2d at 948 n.6 (side-by-side comparison of statutory grounds for vacating an award under Utah Arbitration Act and the Federal Arbitration Act).  But as noted in the text, *supra*, we see no difference in application of the principles relevant to resolution of these appeals.

[6]The statute has recently been renumbered and is now § 78B-11-124.

*Industries*, 894 F.2d 862, 866 (6th Cir. 1990).

As for appellate review of the district court's ruling confirming the arbitration award (and denying the motion to vacate the award), we apply "no special standard" but review the trial court's findings of fact under the clearly erroneous standard and its conclusions of law *de novo*. *Buzas Baseball*, 925 P.2d at 948.

**B**

The majority shareholders contend that the award should have been vacated because the arbitrator failed to resolve the Youngs/Behnken Controversy. The statutory ground relied on here is that the arbitrator exceeded his authority.[7] For a reviewing court to conclude that the arbitrator exceeded his authority, the court must determine that the award "covers areas not contemplated by the submission agreement" or determine that the award is "without

---

[7]At first blush it may seem odd to characterize the failure to resolve one of the disputes as being an act in excess of the arbitrator's authority. The Utah Supreme Court has, however, at least suggested that this would be the case. In *Intermountain Power v. Union Pac. R.R.*, 961 P.2d 320, 322-24 (Utah 1998), the court decided that the alleged failure involved only preliminary questions, resolution of which could have "been used as intermediary mileposts to guide the arbitrator's decision" but was not required. Thus, the court implied that a failure to resolve matters submitted for arbitration could be regarded as an act in excess of the arbitrator's authority. Some federal cases would support that position, *see e.g. Western Employers Ins. v. Jeffries & Co.*, 958 F.2d 258 (9th Cir. 1992), and the Utah Supreme Court has previously consulted cases under the Federal Arbitration Act for guidance in interpreting the state act, *see Buzas Baseball*, 925 P.2d at 947 n.5.

To us, it would seem more natural to place such an omission in the category of prejudicing the rights of a party to the proceeding under either subsection (1)(b)(3) or (1)(c) of section 78-31-124 (now § 78B-11-124). We need not decide that question, however, as the important point is that we agree that an arbitration award is flawed if the arbitrator fails to resolve a matter that the parties submitted pursuant to their agreement. *See generally* J.A. Bryant, Annotation, *Determination of Validity of Arbitration Award Under Requirement That Arbitrators Shall Pass on All Matters Submitted*, 36 A.L.R.3d 649 (1971).

foundation in reason or fact." *Buzas Baseball*, 925 P.2d at 950. We ordinarily would review *de novo* the question whether the Agreement required the arbitrator to resolve the Youngs/Behnken Controversy because this issue turns on interpretation of the arbitration agreement. We need not decide this issue, however. We will assume, for purposes of our analysis, that the Agreement did require the arbitrator to resolve the Youngs/Behnken Controversy.

As noted, the majority shareholders, as the parties seeking to vacate the arbitration result, have "the burden of sustaining such an attack." *Ormsbee Development Co. v. Grace*, 668 F.2d 1140, 1147 (10th Cir. 1982). We conclude that the majority shareholders have fallen short of carrying the burden of persuasion on the issue.

First, it is not certain that the arbitrator did in fact fail to resolve the Youngs/Behnken Controversy.[8] The Agreement provides that the decision on the claims included in the Youngs/Behnken Controversy could be factored into the price to be paid by ANI for the stock held by the minority shareholders "either as an addition or an offset to the amount that may otherwise be payable from ANI to Youngs." Given the presumption of validity accorded to arbitration awards, and the heavy burden of proof on a party seeking to vacate an award, we are not persuaded that the majority shareholders have established even the first premise of their argument. Although we do not know under what legal theories Mr. Behnken believed

_____

[8]We acknowledge that the majority shareholders produced evidence to show that, well into the process, the arbitrator believed that he was not required to resolve the Controversy, and that at a latter point the arbitrator encouraged Mr. Behnken and Mr. Youngs to settle the Controversy outside of the arbitration. This evidence, however, is insufficient to establish that the arbitrator did not resolve the Controversy.

that he could still recoup the losses on his superannuated investments, based on the extremely limited information in this record, it certainly would not have been irrational for the arbitrator to have concluded that those claims had no value. Because the Arbitration Agreement did not require that the arbitrator make specific findings, we will not draw the inference that he failed to decide the Youngs/Behnken Controversy from the mere absence of mention of his decision in the award.

Moreover, even if we were to assume that the arbitrator did not decide the Youngs/Behnken Controversy, we would still hold that the majority shareholders have failed to carry their burden of proof that the arbitrator exceeded his authority by failing to decide that matter. Although we assume that the Agreement gave the majority the right to have the Youngs/Behnken Controversy resolved by the arbitrator, a party may waive the contractual right. *See, e.g., Ormsbee Development*, 668 F.2d at 1147, 1153. "There is no set rule as to what constitutes a waiver or abandonment of the arbitration agreement; the question depends upon the facts of each case and usually calls for a finding by the trier of the facts." *Id.* at 1153. If the majority shareholders did not provide any evidence to the arbitrator to support their claims regarding the Youngs/Behnken Controversy, then they waived their arbitration rights.

The majority shareholders have not even asserted on appeal – nor did they in the district court as far as we have found – that any evidence was presented to the arbitrator to enable him to resolve the Youngs/Behnken Controversy. Certainly our record, and apparently that of the district court, is completely devoid of any indication that any evidence was

produced, or that even any attempt was made to explain to the arbitrator why Mr. Behnken thought he should recoup his losses. In their brief, the majority shareholders assert that the court must consider the evidence produced to the arbitrator. Yet there is no indication where that might be found.

Our record does not include the arbitration record, and it does not appear that the district court's record included it. We note that it is uncertain whether an arbitration record even exists in this case. It appears that there was no formal hearing, just the submission of documents and one or more meetings of some of the parties. Nevertheless, it was the burden of the majority shareholders to provide the district court with the evidence to support their arguments for vacating the arbitrator's award, whether or not that evidence had been formally compiled as an arbitration record.[9]

In sum, the majority shareholders have failed to meet the heavy burden of showing that the arbitration award must be set aside. Drawing all inferences in favor of the award and

---

[9]As we have noted, the minority shareholders argued – and attempted to prove – in the district court that the parties had agreed to resolve the Youngs/Behnken Controversy outside of the arbitration process and had proceeded to do so. *See* III Aplt. App. at 820-22 (Affidavit of Jack Youngs, in which he states that he and Jack Behnken had agreed to a mutual release of claims without other consideration). *See also id.* at 832 (Affidavit of William McDavid, in which he states that Youngs and Behnken agreed at a meeting to resolve the Youngs/Behnken Controversy outside the arbitration). We do not rely on this evidence in our analysis because it was controverted by the affidavit of Jack Behnken and the district court did not resolve the factual question.

We do not have the option to remand the matter to the arbitrator for clarification of this point. Under Utah law (as under the federal Arbitration Act) remand to the arbitrator is available only if the remanded matter could still be resolved within the time permitted under the arbitration agreement. *See* Utah Code Ann. § 78-31a-124(3). In this case, that time had passed before the parties filed their respective motions in the district court.

-12-

finding no evidence to support the majority's assertions, we are unable to conclude that the arbitrator breached his duties under the Agreement by allegedly failing to resolve the Youngs/Behnken Controversy.

**C**

The Arbitration Agreement called for the arbitrator to decide "the Dispute," which was defined to include two clusters of issues. One group of issues, which we have just discussed, was the Youngs/Behnken Controversy. The other group of issues was defined in the Agreement by reference to the pleadings in the litigation in the district court, proceedings which had commenced before the parties entered into the Arbitration Agreement as noted *supra*. Thus, the Agreement recited that the parties wished to resolve "the disputed issues described in the pleadings and other documents" that had been filed in the district court.

The majority shareholders contend that the arbitrator failed "to resolve . . . the disputed issues described in the pleadings . . . that have been filed" in the underlying lawsuit. They assert that the arbitrator did not address the contested issues in his award but only assessed the value of the minority's interest in ANI. Accordingly, they argue, the award lacked foundation in reason or fact and was in excess of the arbitrator's authority.[10]

Of the issues referred to in the Agreement, "the disputed issues described in the pleadings," the appellants discuss only one in their brief. This concerns the real property

---

[10]"If an award is without foundation in reason or fact, the arbitrator may be found to have exceeded his authority. This is sometimes referred to as the irrationality principle." *Buzas Baseball*, 925 P.2d at 950 (internal citations and quotation marks omitted).

formerly owned by ANI which was transferred in 1991 to Behnken Properties and then leased back to ANI. In the award, the arbitrator noted that his calculations included the four-year average rental income for Behnken Properties and that all of this rent had been paid by ANI and Rocky Mountain Milling Co. (which, the arbitrator had earlier stated, was "inseparable in all respects" from ANI). The award further explained that the rental income of Behnken Properties was included in the calculation to include "recognition to the Minority Shareholders of the value associated with the transfer of property and plant" to Behnken Properties. Appellants protest that no claim had been raised in the pleadings relating to the transfer of property to Behnken Properties; instead, they say, there were only allegations that the lease rates charged to ANI were inflated.

The majority shareholders assert that the issue raised in the pleadings concerning Behnken Properties was the allegedly inflated lease rates charged to ANI. The substance of the award (or rather of this component of the award) is the crediting of the lease payments back to ANI. The majority complains that only that portion of the lease payments which might be found to be inflated should have been factored into the award, but they give us nothing by which to assess what that portion might have been.

Moreover, this argument rests on a false premise. The Agreement did not limit the arbitration to the issues raised in the pleadings in the litigation. Instead, the parties specifically agreed that the decision could be, at the arbitrator's discretion, "based upon any factors, claims, counterclaims, defenses, or third party claims that were *or may have been raised*" in the litigation. And the parties chose Mr. Heald to be the arbitrator, knowing that

-14-

he had considerable experience with the issues from his previous service on the ANI board of directors, and also his previous involvement in trying to facilitate settlement of this controversy between the parties.[11]

Again, we do not know with certainty what information may have been given to the arbitrator regarding claims and defenses that could have been raised in the litigation. We do know that we are obligated to defer to the arbitrator's discretion and that the arbitrator had information from his own experience with ANI that may have informed his decision.

The majority shareholders are in effect asking the courts to re-examine the dispute as if we were reviewing the rulings of a district court (but without the record that informs us when we do that). That is most certainly not the role that the courts play in reviewing arbitration awards:

> Courts are not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement. *United Paperworkers v. Misco, Inc.*, 484 U.S. 29, 36, (1987). We recently reiterated that *if an "'arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' the fact that 'a court is convinced he committed serious error does not suffice to overturn his decision.'" Eastern Associated Coal Corp. v. United Mine Workers,* 531 U.S. 57, 62, (2000) (quoting *Misco*, *supra*, at 38).

*Major League Baseball Players Assoc. v. Garvey*, 532 U.S. 504, 509 (2001) (emphasis added). Utah applies the same standard, having quoted the italicized language in the above passage. *See Intermountain Power Agency v. Union Pacific R.R.*, 961 P.2d 320, 323 (Utah

---

[11]As we have noted, the parties in the Agreement expressly noted that Mr. Heald could not be considered a neutral arbitrator as that term is used in the Utah Arbitration Act, and the parties expressly waived any objection based on his background with them.

1998).

We agree with the district court that the majority shareholders have failed to show an abuse of the extremely broad discretion that the majority agreed to grant to the arbitrator. Even if including the entire amount of lease payments was a "serious error," it is not the function of the courts to second-guess the arbitrator when the arbitrator is exercising his discretion in ruling on the matters presented. This argument falls far short of meeting the appellants' heavy burden.

**D**

The majority shareholders contend that the district court erred by refusing to consider evidence submitted to it with their motion to vacate the award. The majority shareholders had attached to their brief a lengthy and detailed "Declaration" by Mr. Ron Haws, the chief financial officer of ANI. The minority shareholders had moved to strike the Declaration, arguing that it was not admissible evidence because Mr. Haws did not say that the statements were based on his personal knowledge, largely failed to specify whether the matters he discussed had been presented to the arbitrator, and included speculation, hearsay and legal conclusions in his Declaration. The district judge denied the motion as moot in his order on the competing motions to vacate and to confirm the award; the judge said that the Haws Declaration "played no part in the court's decision." IV Aplt. App. at 1367.

We see no merit in the majority shareholders' position on this claim of error. The majority shareholders cite to no authority holding that a court has a duty to consider extrinsic evidence going to the merits of the dispute when ruling on a motion to vacate or a motion to

-16-

confirm an arbitration award. Given the very limited scope of judicial review of arbitration awards, we certainly can see no abuse of discretion by the district court in declining to take the Haws Declaration into account.

**E**

The Behnken Siblings assert that they were denied the opportunity to present evidence or otherwise participate in the arbitration. Like the district court, we find no merit in this argument. Most tellingly, the Behnken Siblings never asserted any objection to the proceedings until the award was published to the parties.

Throughout the proceedings, a period of over seven months, the Behnken Siblings had acquiesced in being represented by their father and his employee, Mr. Haws. The siblings signed the Arbitration Agreement and so were aware of their right to submit evidence to the arbitrator. They have not alleged, much less shown, that they attempted to offer any evidence to the arbitrator separately during the seven months from execution of the Agreement to announcement of the award. Like the district court, we are convinced that they had the opportunity to participate in the proceedings independent of their father and elected not to do so. This was shown when they joined all the other parties in asking the district court to extend the stay of judicial proceedings that had been granted so that the arbitration could proceed.[12] Obviously if they had concerns that proceedings were taking place without their knowledge, they could have withheld their consent from the application for the extension of the stay until

---

[12]The Arbitration Agreement was dated May 26, 2005. The parties' joint motion to extend the stay of court proceedings so that the arbitration could be completed was filed on December 15, 2005.

-17-

they were satisfied that they had not been prejudiced by prior proceedings. We agree with the district judge that the contention that the Behnken siblings were not given the opportunity to participate in the proceedings is not credible.

**F**

The final issue raised on appeal is whether the district court erred in setting the date on which pre-judgment interest was to end and post-judgment interest was to begin. We find no error in this respect.

As one might suppose, this issue is raised because there is a significant difference in the two interest rates. The pre-judgment interest rate is set by state law, *see Rositer v. Bob Toomey Truck Leasing, Inc*., 567 F.2d 938, 944-45 (10th Cir. 1977), while the post-judgment rate is set by federal law, *see* 28 U.S.C. § 1961(a). The question raised is when "judgment" occurs to end the accumulation of pre-judgment interest and begin the accumulation of post-judgment interest.

The district judge's order confirming the arbitration award was entered August 9, 2006. After the district court had issued an order denying a motion for attorney's fees and granting the motion for interest on the judgment, the formal entry of judgment was on October 5, 2006. This was followed by an amended judgment five days later. The district court used the date of the first entry of judgment, October 5, as the date for the post-judgment rate to begin. Appellants now contend that the order of August 9 confirming the award ascertained the amount of their liability to the minority shareholders and should have been the date for conversion of the rate of interest on the judgment from the pre-judgment rate under state law

-18-

to the post-judgment rate under federal law.

We disagree.  The statute clearly says that the statutorily set federal rate for post-judgment interest goes into effect on the date of entry of judgment:

> Interest shall be allowed on any money judgment in a civil case recovered in a district court . . . . *Such interest shall be calculated from the date of the entry of the judgment* at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[] the date of the judgment.  . . . .

28 U.S.C. § 1961(a) (emphasis added).

Appellants attempt to sow confusion regarding when the judgment was entered.  But considerable attention has been given to this point by the drafters of the federal rules because it is a matter of importance for several reasons, including this one and (perhaps most important) clarifying when the time for filing a notice of appeal begins to run.  *See* Fed. R. Civ. P. 58.  Judgment was entered in this case when the court filed a separate document in accordance with Rule 58, and the district judge correctly used that date as the time for the post-judgment interest rate to be applied.

## III

The judgment of the district court is AFFIRMED.