**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 28, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

| | |
|---|---|
| In re: HAROLD FREDERICK RIEBESELL, JR., a/k/a Rick Riebesell, officer, director, shareholder of HFR, Inc.; formerly doing business as The Riebesell Law Firm, P.C.; member of Perigee Group LLC and Strategem Company, <br><br> Debtor. <br><br> W.A. JOHNSON, JR., <br><br> Plaintiff-Appellee, <br><br> v. <br><br> HAROLD FREDERICK RIEBESELL, JR., <br><br> Defendant-Appellant. | No. 09-1072 |

**APPEAL FROM THE UNITED STATES**
**BANKRUPTCY APPELLATE PANEL FOR THE TENTH CIRCUIT**
**(BAP No. 08-052-CO)**

Submitted on the briefs:[*]

---

[*]  After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore ordered submitted without oral argument.

Harold Frederick Riebesell, Jr., Pro Se.

D. Bruce Coles, Esq., Law Office of D. Bruce Coles, Denver, Colorado, for Plaintiff-Appellee.

---

Before **O'BRIEN**, **PORFILIO**, and **TYMKOVICH**, Circuit Judges.

---

**O'BRIEN**, Circuit Judge.

---

Plaintiff W.A. Johnson, Jr. brought this adversary proceeding seeking to prevent the discharge of a debt owed to him by his attorney, Harold Frederick Riebesell (the debtor). Johnson claimed the debt was not dischargeable because it was the product of Riebesell's false representations, specifically Riebesell's failure to meet disclosure obligations imposed upon him by the Colorado Rules of Professional Responsibility. After a trial, the bankruptcy court decided most of Riebesell's debt was not subject to discharge. It entered judgment in favor of Johnson on the non-discharged portion of the debt. It further awarded Johnson post-judgment interest at the rate of twenty-four percent (24%), as provided for in the promissory note securing the debt. Riebesell appealed from the bankruptcy court's order to the Tenth Circuit Bankruptcy Appellate Panel (BAP), which affirmed. He now appeals from the BAP decision.[1]

---

[1]    Our jurisdiction derives from 28 U.S.C. § 158(d).

## BACKGROUND

Riebesell is an attorney licensed in Colorado since 1972. Johnson is a retired computer information consultant who worked primarily in the health care field. The two men have known each other since the early 1960s, when they went to high school together. Later they lived in the same neighborhood where they socialized on occasion and their children sometimes played together.

In July 1999, Johnson hired Riebesell as his attorney to prepare a consulting agreement and stock subscription agreement between Johnson and a small technology-based management consulting company. Riebesell prepared and delivered the requested agreements. They were executed in October 1999. Johnson did not formally engage Riebesell to perform any further legal services at that time, but neither did the parties formally terminate the attorney-client relationship.

Less than two months after the documents were executed, Riebesell asked Johnson for a personal loan of $90,000 for a period of one year. Riebesell told Johnson his move from one law firm to another had left him temporarily short of cash, but he was confident in the prospects for his future financial success at the new firm. He needed the loan to serve as a bridge between the two practices.

Johnson agreed to make the loan. On December 14, 1999, he issued a personal check to Riebesell in the requested amount. In return, Riebesell

prepared and delivered an unsecured promissory note with a one-year term, bearing interest at the rate of twelve percent (12%) per annum (the "1999 note").

At the time Johnson made the loan, the Colorado Rules of Professional Conduct provided as follows:

>    (a)  A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:
>
>>    (1)  the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;
>
>>    (2) the client is informed that use of independent counsel may be advisable and is given a reasonable opportunity to seek the advice of such independent counsel in the transaction; and
>
>>    (3) the client consents in writing thereto.

Colo. R. Proff'l Conduct 1.8(a) (1993).[2]

Riebesell made none of the disclosures required by Rule 1.8(a) in connection with the $90,000 loan transaction.  And Johnson did not investigate Riebesell's financial condition or consult with outside counsel in connection with the loan transaction.  According to his later testimony, Johnson agreed to make

_____

[2]    Rule 1.8(a) was amended in 2007 but the amendments were minor and do not impact our analysis or decision in this case.

the loan because Riebesell "was a long-term friend, he was my attorney, I relied on him." Aplt. App. at 42.

In April 2000, before the 1999 note was due, Johnson again hired Riebesell to perform legal work in the form of a comprehensive estate plan. The plan included a family limited partnership agreement involving a limited liability company (LLC). In August 2000, while working on the operating agreement for the LLC, Riebesell informed Johnson that his financial affairs had not gone as planned and he would be unable to pay the 1999 note when it fell due in December 2000. Johnson agreed to a one-year extension of the due date. Riebesell later delivered the operating agreement, which was executed on November 13, 2000.

Riebesell prepared a new unsecured promissory note, dated August 29, 2000; it incorporated the principal and accrued interest on the December 1999 note (the "2000 note"). The new principal balance was $97,663.56. The note bore interest at the rate of twelve percent (12%) per annum and the entire amount was due no later than January 31, 2001. According to the terms of the new note, in the event of default Johnson could opt to accelerate the loan, in which case it would become immediately due and payable and bear interest at the rate of twenty-four percent (24%). Again, no disclosures under Rule 1.8(a) were made in connection with this loan, and Riebesell made no payments on it.

Following execution of the 2000 note, the parties' attorney-client relationship continued. In late 2000, Johnson asked Riebesell for legal advice concerning real estate investments; in 2001, he asked him to draft a revised will; and in 2002, he directed Riebesell to prepare an irrevocable insurance trust.

By 2002, the 2000 note was in default and Riebesell told Johnson he had no funds with which to pay it. In an attempt to generate funds to pay the note, Johnson agreed to help Riebesell form a consulting business called Perigee Group LLC ("Perigee"). Perigee would share office space with Riebesell's new law firm, the Riebesell Law Firm, P.C., and Johnson would provide consulting services to Perigee.

Johnson agreed to loan Riebesell an additional $45,000 as seed money for the new endeavor. He advanced $20,000 in December 2002, $10,000 in February 2003, and $15,000 in April 2003. In exchange for these advances on April 22, 2003, Riebesell executed a new unsecured note in favor of Johnson in the amount of $194,303.94 (the "2003 note"). The 2003 note represented the sum of three items: the principal of the 2000 note ($97,663.56); the accrued interest on the 2000 note ($51,640.38); and the amounts lent for the Perigee business ($45,000). The entire sum was due and payable on or before January 31, 2005. The 2003 note bore interest at twelve percent (12%) per annum and contained a default interest rate of twenty-four percent (24%) per annum.

By March or April 2003, the parties' personal and business relationship had soured. Johnson left the office space, refused to provide consulting services to Perigee, and terminated Riebesell's legal representation.

Riebesell defaulted on the 2003 note when it came due. In May 2006, Johnson filed a collection action against Riebesell in state court. That same month, on May 26, 2006, Riebesell filed for Chapter 7 relief.

Riebesell's Schedule of Creditors Holding Unsecured Nonpriority Claims identified thirty-nine creditors. About a third of these, including Johnson, were individuals, many of them current or former clients of his law practice. Riebesell had borrowed nearly $1 million from these individuals.

Johnson filed this adversary proceeding in November 2006, seeking judgment in the principal amount of the 2003 note, interest at the default rate of twenty-four percent (24%), and to except the debt from discharge. On September 20, 2007, Riebesell signed a Conditional Admission of Misconduct with the Colorado State Bar involving one of his debts to another former client. He admitted to violating Colorado Rule of Professional Conduct 1.8(a) by borrowing money from a client on terms that were not fair and reasonable to the client under the circumstances and by failing to inform the client that the use of independent counsel might be advisable.

Johnson's claims were tried to the bankruptcy court. It: 1) granted judgment in favor of Johnson for the full amount of the 2003 note and accrued

interest to the date the adversary proceeding was filed, less the $45,000 he had loaned Riebesell as part of the Perigee business and any interest attributable to the Perigee debt, 2) declared the portion of the debt for which it had granted judgment non-dischargeable, and 3) provided the judgment would bear interest at the rate of twenty-four percent (24%). Johnson submitted a proposed order calculating the amount of the non-dischargeable judgment at $300,475.13, which the district court signed over Riebesell's objection.

Riebesell appealed to the BAP, which affirmed the bankruptcy court's order. Johnson did not cross-appeal from the bankruptcy court's decision determining that the $45,000 was dischargeable.

## ANALYSIS

### 1. Standard of Review

This is an appeal from a BAP decision. *See* 28 U.S.C. § 158(d)(1). But, "we review only the Bankruptcy Court's decision." *Alderete v. Educ. Credit Mgmt. Corp. (In re Alderete)*, 412 F.3d 1200, 1204 (10th Cir. 2005); *Johnson v. Smith (In re Johnson)*, 575 F.3d 1079, 1082 (10th Cir. 2009). "By this we do not mean that we ignore the procedural posture of the case before us-an appeal from a BAP decision. Rather, we mean that we treat the BAP as a subordinate appellate tribunal whose rulings are entitled to no deference (although they certainly may be persuasive)." *Mathai v. Warren (In re Warren)*, 512 F.3d 1241, 1248 (10th Cir. 2008). We review matters of law de novo, and factual findings (which

-8-

are made only by the bankruptcy court, not the BAP), we review for clear error.

*See Gullickson v. Brown* (*In re Brown*), 108 F.3d 1290, 1292 (10th Cir. 1997).

## 2. False Representation

The bankruptcy court concluded the debt was non-dischargeable pursuant to

11 U.S.C. § 523(a)(2)(A) because Riebesell had made a false representation to

Johnson in connection with the loan. The pertinent statute reads as follows:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt--
>
> . . . .
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A).

In order to establish a non-dischargeable claim under this subsection, a

creditor must prove the following elements by a preponderance of the evidence:

"The debtor made a false representation; the debtor made the representation

with the intent to deceive the creditor; the creditor relied on the representation;

the creditor's reliance was reasonable; and the debtor's representation caused

the creditor to sustain a loss." *Fowler Bros. v. Young (In re Young)*, 91 F.3d

1367, 1373 (10th Cir. 1996).[3]  Riebesell contends the § 523(a)(2)(A) requirements for non-dischargeability are not satisfied for several reasons:

(1) he had no attorney-client relationship with Johnson when the loan was negotiated or completed and, hence, he had no duty to make the Rule 1.8(a) disclosures;

(2) the transaction falls into an exception contained in the official commentary to Rule 1.8(a) exempting standard commercial transactions between a lawyer and a client;

(3) he did not make a false representation in connection with the loans with the intent of deceiving Johnson; and

(4) there was no showing that Johnson justifiably relied on the attorney-client relationship in making the loans.

We consider each of these arguments in turn.

### A.  Attorney-Client Relationship

Under Colorado law,

> An attorney-client relationship is established when it is shown that the client seeks and receives the advice of the lawyer on the legal consequences of the client's past or contemplated actions.  The relationship may be inferred from the conduct of the parties.  The proper test is a subjective one, and an important factor is whether the client believes that the relationship existed.

---

[3]     As discussed further, *infra*, the Supreme Court later clarified that the proper standard is "justifiable reliance" rather than "reasonable reliance."

-10-

Further, the attorney-client relationship is an ongoing relationship giving rise to a continuing duty to the client unless and until the client clearly understands, or reasonably should understand, that the relationship is no longer to be depended on.

*People v. Bennett*, 810 P.2d 661, 664 (Colo. 1991) (en banc) (per curiam) (quotations and citations omitted).

Riebesell says an attorney-client relationship did not exist at the time of the first (1999) loan because his legal services relating to the consulting agreement and stock subscription agreement were complete by the time Johnson made the loan. But we agree with the bankruptcy court, which held otherwise – an attorney-client relationship did exist because (1) the relationship did not formally terminate until March or April 2003, when Johnson terminated it; (2) in his Conditional Admission of Misconduct, Riebesell recognized an attorney-client relationship with a different client on facts less compelling than those involving Johnson; and (3) in *Bennett*, the Colorado Supreme Court recognized an attorney-client relationship on facts similar to those in this case. *See Bennett*, 810 P.2d at 664.

Riebesell also says no attorney-client relationship should be recognized at the time of the 2000 note because, although he was representing Mr. Johnson on other matters at that time, the new note merely capitalized the accrued interest and thus did not amount to a new loan. But § 523(a)(2)(A) reaches a "renewal, or refinancing of credit, to the extent obtained by . . . a false representation," as well

-11-

as an original extension of credit.[4]  He further argues that Johnson did not depend

on the attorney-client relationship in connection with the execution and delivery

of the note.  But at this stage of inquiry the existence of an attorney-client

relationship is the issue, not Johnson's "dependence" on that relationship.  The

requisite attorney-client relationship existed when the 2000 note was negotiated,

executed and delivered.[5]

### B.  "Standard Commercial Transaction" Exception

Riebesell contends he was not obligated to make the disclosures required

by Rule 1.8(a) because the loans from Johnson were "standard commercial

transactions."  He relies on Official Commentary to the Rule indicating it

> does not apply to standard commercial transactions between the
> lawyer and the client for products or services that the client generally
> markets to others, for example, banking or brokerage services,
> medical services, products manufactured or distributed by the client,
> and utilities' services.  In such transactions, the lawyer has no
> advantage in dealing with the client, and the restrictions in paragraph
> (a) are unnecessary and impracticable.

Colo. R. Prof'l Conduct 1.8, cmt. 1 (1993).

---

[4]     Riebesell rather callously claims his execution of the second note was an "action[] favorable to [Johnson]" rather than a sign of Johnson's dependence on the attorney-client relationship.  Aplt. Opening Br. at 12.  This argument ignores other consideration for the 2000 note – the extension of the obligation's due date and forbearance of litigation as well as capitalization of interest.

[5]     Although the attorney-client relationship appears to have been severed by the time of the third note, executed in 2003, the damage had already been done with regard to the portion of the debt the bankruptcy court found to be non-dischargeable.  Johnson had advanced the money to his attorney and he had not been repaid.

We find the BAP's reasoning on this point compelling:[6]

> [Riebesell] attempts to characterize several transactions throughout which he represented [Johnson] as "making loans;" i.e., the purchase of stock in the small technology-based management consulting company in 1999, and the real estate investment in 2000. These transactions hardly elevate [Johnson] to the position of being in the banking or brokerage business. Further, [Johnson] testified that he had never loaned money to anyone personally prior to making the loan to [Riebesell]. [Riebesell's] argument regarding the standard commercial transaction exception is without merit, and little more than wishful thinking.

Aplt. App. at 330.

The loans to Riebesell were not "standard commercial transactions" exempt from the requirements of Rule 1.8(a).[7]

## C. Intent to Deceive

Riebesell next argues his intent to deceive Johnson was not proved by a preponderance of the evidence. Riebesell's failure to make the disclosures required by Rule 1.8 constitutes a "false representation" within the meaning of § 523(a)(2)(A). *See Young*, 91 F.3d at 1374 (stating attorney's "failure to disclose [the] information [required under a similar New Mexico Rule of Professional Conduct] constitutes a 'false representation' or 'false pretenses'

---

[6]    The bankruptcy court did not reach a conclusion on this issue. Nevertheless, the BAP addressed it on the merits.

[7]    Riebesell argues that the BAP failed to provide any record evidence for its conclusion that Johnson had not previously made personal loans prior to his loan to Riebesell. At trial, Johnson was asked, "Prior to making that loan [to Riebesell] did you have any practice with making personal loans from your own funds?" to which he replied "No." Aplt. App. at 40.

under § 523(a)(2)(A).").  On appeal to the BAP, Riebesell did "not appear to contest that failure to comply with CRPC Rule 1.8 constitutes a false representation or false pretenses."  Aplt. App. at 327.  However, in order to satisfy the criteria for non-dischargeability, the false representation must also have been made with the intent to deceive Johnson.  *Young*, 91 F.3d at 1375.  Riebesell claims such an intent was lacking because he did not attempt to hide his deteriorating financial condition from Johnson, who voluntarily agreed to loan the money.

His argument is too simplistic.  The intent to deceive "may be inferred from the totality of the circumstances."  *Id.* (quotation omitted).  And that is precisely the inference drawn by the bankruptcy court.  It concluded that Johnson's trust in Riebesell, his attorney, caused him, like so many others, to fall for Riebesell's scheme of borrowing money from clients.  Riebesell ensnared several other clients and he continued to do so until just three months before he filed his bankruptcy petition.  *See Johnson v. Riebesell (In re Riebesell)*, 399 B.R. 830, 840 (Bankr. D. Colo. 2008).[8]  It also found Riebesell's 2004 transfer of title to his residence to his wife was accomplished to shield the asset from creditors, further

---

[8]     Riebesell argues that his treatment of other client debtors is not probative of his intent to deceive Johnson, because they loaned him money after Johnson did and because they were sophisticated business and professional people, and many of them were represented by counsel.  Aplt. Opening Br. at 16.  These arguments do not defeat the bankruptcy court's finding that the treatment of other client debtors was quite probative of Riebesell's intent to deceive Johnson.

grounds to infer an intent to deceive. Although Riebesell attributes his failure to repay the loans to unintended circumstances beyond his control, the bankruptcy court did not, as a whole, find Riebesell's testimony credible. Based on our review of the record, the bankruptcy court's finding that Riebesell had the requisite intent to deceive Johnson was not clearly erroneous.[9]

### D.  Justifiable Reliance

The fourth element of the § 523(a)(2)(A) test requires the creditor's reliance to be "reasonable."  The appropriate standard is not "reasonableness" in the sense of whether an objectively reasonable person would have relied upon the debtor's false representations.  Rather, the inquiry is whether the actual creditor's reliance was "justifiable" from a subjective standpoint. *Field v. Mans*, 516 U.S. 59, 74-75 (1995).  In determining whether a creditor's reliance was justifiable, a court should therefore examine "the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than [applying] a community standard of conduct to all cases." *Id.* at 71 (quotation omitted).  Even under the "justifiable" test, however, the plaintiff must "use his senses" and at least make "a cursory examination or investigation" of the facts of the transaction before entering into it. *Id.* (quotation omitted).  Moreover, this test "does not

---

[9]      Riebesell also argues that if his conduct toward the other client debtors had truly been deceitful, more of them would have sued him.  Aplt. Opening Br. at 16. The bankruptcy court gave numerous reasons for rejecting this argument, and we find all of them persuasive. *See Riebesell*, 399 B.R. at 840.

leave [objective] reasonableness irrelevant, for the greater the distance between the reliance claimed and the limits of the [objectively] reasonable, the greater the doubt about reliance in fact." *Id.* at 76. In effect, "reasonableness goes to the probability of actual reliance." *Id.*

Although his argument on this point is not easy to follow, Riebesell appears to contend the bankruptcy court and the BAP applied a purely subjective standard of justifiable reliance, abandoning the measuring stick of reasonableness altogether. He says Johnson could not have actually and justifiably relied on the attorney-client relationship as a basis for lending him money, noting Johnson "is an astute businessman who was well-educated. He was interested in making loans as an investment. He had access to other attorneys." Aplt. Opening Br. at 17-18. And, he argues, Mr. Johnson knew of his declining financial condition, but kept loaning him money anyway.

The bankruptcy court was not insensitive to these considerations. By the time Johnson lent Riebesell the final $45,000, the bankruptcy court decided his reliance on Riebesell as his attorney was no longer justifiable, saying Johnson "was not a naif, but was, instead a competent business man" who was well aware that Riebesell's declining financial condition made it unlikely that he would be repaid. *Riebesell*, 399 B.R. at 841. But it refused to extend the same reasoning to the initial loan, noting Johnson's testimony that he was a long-standing friend and client of Riebesell's, and trusted him. It also noted the other clients of

-16-

Mr. Riebesell's who were similarly defrauded. In sum, the bankruptcy court's

conclusion – Johnson justifiably relied on Riebesell's false representations – was

not clearly erroneous.

### 3. Bankruptcy Court's Jurisdiction to Enter Money Judgment[10]

---

[10] Johnson contends, without citation to any authority, Riebesell has waived appellate review of his issues involving the bankruptcy court's jurisdiction to enter a money judgment and the appropriate interest rate. According to Johnson, in order to raise these issues, Riebesell should have (1) filed a separate notice of appeal to the BAP from the final judgment issued on July 29, 2008, and (2) submitted a transcript to the BAP of the final judgment hearing that occurred on July 29, 2008.

The BAP addressed both of the allegedly waived issues on the merits. If it *lacked jurisdiction to do so*, however, this would not permit us to exercise appellate review. *See Lang v. Lang (In re Lang)*, 414 F.3d 1191, 1196 (10th Cir. 2005) ("[A]n untimely appeal to [the BAP] precludes a subsequently reviewing circuit court from reaching the underlying bankruptcy court ruling even when the intermediate court has erroneously done so."). But any defect here is not jurisdictional.

First, in its Findings of Fact, Conclusions of Law and Order of May 23, 2008, from which Riebesell pursued a timely appeal, the bankruptcy court both entered judgment against him and set an interest rate of twenty-four percent (24%), the exact actions of which he complained on appeal to the BAP and now complains to this court. *Riebesell*, 399 B.R. at 841. The bankruptcy court's later judgment of July 29, 2008, merely calculated the *amount* of the judgment and entered judgment in accordance with the earlier order. The bankruptcy rules provide that "[a] notice of appeal filed after the announcement of a decision or order but before entry of the judgment, order, or decree shall be treated as filed after such entry and on the day thereof." Bankr. R. 8002(a). Thus, even if Mr. Riebesell's notice of appeal from the order of May 23, 2008 was premature, it ripened once the later judgment was entered and was sufficient to raise the issues he wished to raise concerning the bankruptcy court's ability to enter judgment and the appropriate interest rate.

Second, any defect in the appellate record before the BAP was not a jurisdictional defect. *See* Bankr. R. 8001 ("An appellant's failure to take any step other than timely filing a notice of appeal does not affect the validity of the

(continued...)

As part of its order denying discharge of the debt, the bankruptcy court entered judgment against Riebesell for the non-dischargeable portion of the debt. Riebesell argues it lacked jurisdiction to do so. He contends the underlying state law action on the debt neither "arises under" nor is "related to" a case under Title 11 and is therefore outside the jurisdiction of the bankruptcy court. 28 U.S.C. § 1334(b).

Pursuant to § 1334(b), the district courts have exclusive jurisdiction of all bankruptcy cases under Title 11 of the United States Code, and "original but not exclusive jurisdiction of all civil proceedings arising under Title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). In accordance with this grant of jurisdiction, district courts may refer "core" and "related-to" proceedings to the bankruptcy courts for adjudication. *See* 28 U.S.C. § 157. As Riebesell acknowledges, a proceeding to determine non-dischargeability of a debt under § 523 is a core proceeding arising under the bankruptcy code and may be determined by a bankruptcy court. *See Morrison v. W. Builders of Amarillo, Inc. (In re Morrison)*, 555 F.3d 473, 478 (5th Cir. 2009). The question is "whether a bankruptcy court, in addition to declaring a debt non-dischargeable, has jurisdiction to liquidate the debt and enter a monetary judgment against the debtor." *Id.*

---

[10](...continued)
appeal[.]"). It therefore does not affect our ability to hear the issues on appeal.

-18-

According to the circuit courts that have considered this issue, bankruptcy courts do possess such jurisdiction. *See, e.g., Morrison*, 555 F.3d at 478-80; *Cowen v. Kennedy (In re Kennedy)*, 108 F.3d 1015, 1017-18 (9th Cir. 1997); *Longo v. McLaren (In re McLaren)*, 3 F.3d 958, 965-66 (6th Cir. 1993); *cf. Porges v. Gruntal & Co. (In re Porges)*, 44 F.3d 159, 163-65 (2d Cir. 1995) (holding bankruptcy court had jurisdiction to enter money judgment after determining validity of contested proof of claim, even after voluntary dismissal of bankruptcy case); *N.I.S. Corp. v. Hallahan (In re Hallahan)*, 936 F.2d 1496, 1507-08 (7th Cir. 1991) (rejecting debtor's claim of a right to jury trial on underlying debt in dischargeability proceeding). The reasons usually given include: 1) determination of the debt lies within the equitable jurisdiction of the bankruptcy court; 2) the debtor by filing bankruptcy has consented to jurisdiction of the bankruptcy court over matters necessary to the determination of adversarial proceedings; and 3) judicial economy and efficiency require that the bankruptcy court be empowered to settle both the dischargeability of the debt and the amount of the monetary judgment. *See, e.g., Hallahan*, 936 F.2d at 1507-08. Our prior case law is not inconsistent with these rationales. *See generally RTC v. McKendry (In re McKendry)*, 40 F.3d 331, 336 (10th Cir. 1994) ("In bankruptcy court there are two separate and distinct causes of action[.] One cause of action is on the debt and the other cause of action is on the dischargeability of that debt." (quotation omitted)). Finding these cases persuasive, we conclude that the

bankruptcy court had jurisdiction to enter a monetary judgment against Mr. Riebesell as a part of this adversarial proceeding.

### 4. Interest Rate

Finally, Riebesell challenges the bankruptcy court's decision to award post-judgment interest at twenty-four percent (24%), the penalty rate contained in the 2003 note. According to him post-judgment interest should have been awarded at the statutory rate contained in 28 U.S.C. § 1961 rather than at the rate set in the note. Section 1961 provides in pertinent part that

> Interest shall be allowed on any money judgment in a civil case recovered in a district court. . . . Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment. The Director of the Administrative Office of the United States Courts shall distribute notice of that rate and any changes in it to all Federal judges.

28 U.S.C. § 1961(a) (footnote omitted).

We review de novo the bankruptcy court's interpretation and application of § 1961. *Society of Lloyd's v. Reinhart*, 402 F.3d 982, 1003 (10th Cir. 2005). "Because a bankruptcy court is part of the district court, [§ 1961] applies to bankruptcy proceedings." *Pester Refining Co. v. Ethyl Corp. (In re Pester Refining Co.)*, 964 F.2d 842, 849 (8th Cir. 1992).

The judgment here was entered in federal court and is a federal judgment. In upholding the bankruptcy court's application of a post-judgment interest rate of

twenty-four percent (24%) however, the BAP reasoned that Johnson's entitlement to "a judgment measured by the 'benefit-of-the-bargain rule'" entailed post-judgment interest at the contractual rate rather than the federal judgment rate in § 1961. Aplt. App. at 335-36. We cannot agree.

"[P]arties may contract to, and agree upon, a post-judgment interest [rate] other than that specified in § 1961." *Reinhart*, 402 F.3d at 1004. But to do so, they must specifically contract around the general rule that a cause of action reduced to judgment merges into the judgment and the contractual interest rate therefore disappears for post-judgment purposes. *See id.*[11] "If parties want to override the general rule on merger and specify a post-judgment interest rate, they must express such intent through clear, unambiguous and unequivocal language." *Id.* (quotation omitted).

No such language is present in the promissory note before us. The general provision in the note that Colorado law will apply is insufficient to avoid § 1961. *See Reinhart*, 402 F.3d at 1004. Nor does the note's provision that upon default and acceleration, the amount then due on the note "shall accrue interest until

---

[11]    In reaching its decision that a rate of twenty-four percent (24%) should prevail, the BAP cited Colorado statutes pertaining to post-judgment interest rates that apply the rate specified in the contract or writing. *See* Colo. Rev. Stat. § 5-12-102(4)(a) (1984). But even in cases founded on diversity jurisdiction, the post-judgment interest rate on a federal court judgment is established by federal law, not state law. *See Youngs v. Am. Nutrition, Inc.*, 537 F.3d 1135, 1146 (10th Cir. 2008).

payment at the rate of twenty-four percent (24%) per annum or the highest rate permitted by law, whichever is less," suffice. Aplt. App. at 180. The parties did not contract for a post-judgment interest rate percentage; accordingly, the federal rate applies.

## CONCLUSION

The judgment of the BAP is AFFIRMED, with the exception of that portion of the judgment affirming the bankruptcy court's award of post-judgment interest at the rate of twenty-four percent. That portion of the BAP's judgment is REVERSED, and this case is REMANDED with instructions to remand to the bankruptcy court to vacate its award of twenty-four percent interest and to enter an amended judgment awarding post-judgment interest at the rate provided in 28 U.S.C. § 1961.