# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

No. 12-20100

May 3, 2013

Lyle W. Cayce
Clerk

TRICON ENERGY LIMITED,

Plaintiff–Appellee
Cross–Appellant,

versus

VINMAR INTERNATIONAL, LIMITED,

Defendant–Appellant
Cross–Appellee.

Appeals from the United States District Court
for the Southern District of Texas

Before STEWART, Chief Judge, SMITH and WIENER, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

An arbitration panel awarded Tricon Energy Ltd. ("Tricon") damages, and post-award interest on those damages at 8.5%, because Vinmar International, Ltd. ("Vinmar"), breached a contract. Vinmar appeals a judgment confirming the award, claiming the parties never agreed to arbitrate. Tricon cross-appeals, contending the district court improperly granted postjudgment interest at the

No. 12-20100

statutory rate instead of the rate assigned by the arbitrators.  We affirm.


I.

Working through a broker, Vinmar agreed to buy 5000 metric tons of mixed xylene ("MX"—an industrial petrochemical) from Tricon.[1]  The parties reached a binding agreement when the broker matched Vinmar's firm bid with Tricon's firm offer.  The broker sent Rick Wilson, Vinmar's trader, and Brad Lockwood, Tricon's trader, a two-page memorandum confirming the deal, then a second memorandum reflecting a change requested by the parties, then a third memorandum fixing a typographical error.

The next day, Lockwood emailed Wilson that "I'm pleased to attach a copy of our sales contract to you for the [MX] deal from yesterday.  Please let Vuk [Rajevac] know the contact details for your logistics colleague, so he can be sure to arrange everything properly on this.  Thanks for the business."  The attached four-page contract incorporated most of the terms in the broker's memoranda and included additional terms, including a clause calling for arbitration of all disputes arising under the purchase agreement.  On the last page were signature blocks for Lockwood and Wilson; below the blocks, the contract stated, "Please advise your agreement by signing the foregoing and returning via fax . . . within 24 hours.  In the event we do not receive your reply as requested, then this contract shall be the governing instrument."  Neither Lockwood nor Wilson filled in the signature blocks.

Wilson forwarded the contract to Laurentiu Pascu, Vinmar's supply-chain specialist, via an email stating, "Laurentiu, I bough[t] MX from Tricon please

---

[1] The facts, which neither party disputes, are condensed from the district court's memoranda and orders.

No. 12-20100

contact them and make necessary arrangements."[2] After reviewing the contract and making handwritten notes on the document with Vinmar's suggested changes (none of which related to the arbitration clause), Pascu scanned the marked-up sales contract and emailed it to Vuk Rajevac, his counterpart at Tricon, per an email reading,

> Dear Vuk,
>
> Please find enclose[d] our comments on your Sale Confirmation. We shall revert soon with our Purchase Order for your review. . . .
>
> Best regards,
> Laurentiu Pascu
>
> Vinmar International Ltd.

Rajevac replied that day:

> Hi Laur[e]ntiu,
>
> To answer your questions:
>
> 1) Your comments on the contract well noted and accepted except for Demurrage time bar which is 90 days as per industry wide standard . . .
>
> If you have any questions, let me know.  Thanks!
>
> Best Regards!
>
> Vuk Rajevac
> TRICON ENERGY, Ltd.

Lockwood testified that in the aromatics trading industry, after a deal is reached through a broker, the contracting parties pass paper to propose addi-

---

[2] In the subsequent arbitration proceeding, Wilson testified that Pascu's role was to "make sure . . . that the terms of the agreement are consistent with what we've agreed to" and "to execute" "all the financial and contractual agreements."

tional terms and that it is common for the parties not to agree to some of the proposed additional terms but to proceed with the deal nonetheless. Rajevac testified that the parties' correspondence replaces the broker's confirmation of the deal and expands on it with additional terms but does not change the deal already made.

On July 31, 2008—after the price of MX had fallen dramatically—Wilson sent Lockwood an instant message offering to "wipe the slate clean," which Lockwood rejected. Wilson then emailed Rajevac that Vinmar could "not accept open origin for this material, it must [be] from the USA." Neither the broker's confirmation nor the sales contract specified that the MX had to have been manufactured in the U.S.; Tricon asserts that this email was the first time Vinmar had demanded U.S.-origin MX. Rajevac informed Wilson that Tricon could not guarantee U.S. origin, because it could not satisfy both that demand and the contract's delivery window. Vinmar refused to declare a discharge port on August 8, 2008, the date specified in the broker's confirmation and Tricon's sales contract. Tricon sold some of the MX but was unable to find a buyer for the rest.

## II.

A year later, Tricon initiated arbitration proceedings, alleging breach of contract. A three-member arbitration panel concluded that the parties had entered into a binding contract when they negotiated the transaction through their broker and that the terms of the contract were those summarized in the broker's last revised memorandum. The panel found that Tricon had proposed additional terms when it sent Vinmar its sales contract and that most of the additional terms—including the arbitration clause—became part of the agreement when Rajevac accepted Pascu's comments on Tricon's sales contract. Tricon was awarded $1,338,776.72 in damages plus pre- and post-award interest at the contractual rate of 8.5%, costs, and attorney's fees.

No. 12-20100

Tricon petitioned to confirm the arbitration award under 9 U.S.C. § 207; Vinmar counterclaimed and moved to vacate the award. The district court declined to vacate and directed the parties to submit a proposed order confirming the award and entering final judgment. Tricon's proposed judgment gave post-judgment interest at 8.5%; Vinmar's designated the default federal rate under 28 U.S.C. § 1961. After reviewing the arguments and relevant caselaw, the court awarded postjudgment interest at the federal rate.

Vinmar appeals the order confirming the award, insisting that the parties never agreed to arbitrate. Tricon appeals the award of postjudgment interest at the federal statutory rate, contending that the court impermissibly disregarded the arbitrator's award of a higher rate.

### III.

We review an order confirming an arbitration award under the same standard as for any other district-court decision[3]: Factual findings are reviewed for clear error and conclusions of law *de novo*. *Hughes Training*, 254 F.3d at 592. The district court concluded that Vinmar had failed to raise a genuine issue of material fact concerning the agreement to arbitrate. A dispute of material fact is "genuine" if the evidence would permit a reasonable fact finder to rule in favor of either party.[4] We review *de novo* the award of postjudgment interest under 28 U.S.C. § 1961. *See Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 100 (2d Cir. 2004).

---

[3] *See Hughes Training Inc. v. Cook*, 254 F.3d 588, 592 (5th Cir. 2001) (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 947–49 (1995)).

[4] *See Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 272–73 (5th Cir. 1987) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

No. 12-20100

IV.

The parties agree, at least for the purpose of this case, that they formed a contract no later than July 22, 2008, when the broker matched Vinmar's firm bid with Tricon's firm offer. They dispute whether they agreed to modify that contract by adding an arbitration agreement.

"[A]rbitration is simply a matter of contract . . .; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *First Options*, 514 U.S. at 943. Unless the parties agreed to submit the question of arbitrability to arbitration, the court must decide the question independently, "apply[ing] ordinary state-law principles that govern the formation of contracts." *Id.* at 943–44.[5]

The parties agree that the contract-formation principles of the Texas Uniform Commercial Code apply, and under it, "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." TEX. BUS. & COM. CODE § 2.204(a). An offer "invit[es] acceptance in any manner and by any medium reasonable in the circumstances" unless the language or circumstances of the offer "unambiguously" indicate otherwise. *Id.* § 2.206(a). Once a contract is formed, "[a]n agreement modifying [that] contract . . . needs no consideration to be binding." *Id.* § 2.209(a).

The district court concluded, as a matter of law, that "Vinmar assented to the additional terms—including the arbitration clause—proposed in the Tricon sales contract that was attached to the July 24, 2008 email." Reviewing the record evidence, the court held that Tricon's sales contract offered additional terms. When Pascu marked up and returned the document, he accepted those

---

[5] *See also Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 218 (5th Cir. 2003) ("Where the very existence of any agreement is disputed, it is for the courts to decide at the outset whether an agreement was reached, applying state-law principles of contract.").

6

terms to which he did not object, including the arbitration provision, and he counter-offered other terms. Thereafter, Rajevac agreed to Pascu's modified terms except one, the demurrage bar. As the district court cogently explained, "Read as a whole, [Pascu's] email and the accompanying marked-up sales contract—which struck out some language, inserted some language, and check-marked some clauses [including arbitration] in the contract—conveyed Vinmar's assent to the un-objected to additional terms in the sales contract."

Vinmar does not assert, at least primarily, that the district court was wrong to conclude that the parties agreed to arbitration, but Vinmar urges that the court was wrong to conclude so as a matter of law. Vinmar's main argument is that assent to a contract depends on the intent of the parties, which is normally a question of fact, not law.

"The issue of whether the parties required that the agreement be signed to be considered binding is one of intent, and, therefore, the issue is normally a fact question for the jury to decide." *Scaife v. Associated Air Ctr. Inc.*, 100 F.3d 406, 410 (5th Cir. 1996).[6] Whatever the usual approach, there is nothing wrong, *per se*, with a court's deciding intent as a matter of law. "Although whether the parties intended to be bound is often a question of fact, it may be determined as a matter of law." *WTG Gas Processing, L.P. v. ConocoPhillips Co.*, 309 S.W.3d 635, 643 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).[7] That is especially true where, as here, the negotiations were in writing.[8] Even our panel in *Scaife*,

---

[6] *See also Simmons & Simmons Constr. Co. v. Rea*, 286 S.W.2d 415, 417 (Tex. 1955) ("[I]ntention is usually an inference to be drawn by the fact finder from other facts and circumstances in evidence.").

[7] *See also Lone Star Steel Co. v. Scott*, 759 S.W.2d 144, 157 (Tex. App.—Texarkana 1988, writ denied) ("Once a determination has been made as to what passed between the parties, decisions as to whether their agreement meets the legal requirements of a contract and its interpretation are questions of law.").

[8] *Gilbert v. Pettiette*, 838 S.W.2d 890, 893 (Tex. App.—Houston [1st Dist.] 1992, no writ) (continued...)

No. 12-20100

100 F.3d at 411, held, as a matter of law, that the "parties intended to manifest their assent to this agreement through a formal written contract signed by both parties." *Scaife*, 100 F.3d at 411.

Vinmar next contends that the unsigned signature lines on the sales contract raise, at the very least, a genuine dispute of fact if not grounds to render a decision in Vinmar's favor. In Texas, "the presence or absence of signatures on a written contract is relevant to determining whether the contract is binding on the parties. . . . [I]f the parties have unconditionally assented to terms stated in an unsigned document, the document constitutes a binding written contract, regardless of whether it is signed." *In re Bunzl USA, Inc.*, 155 S.W.3d 202, 209 (Tex. App.—El Paso 2004, no pet.). Although signatures are not required, "the parties may provide that the signature of each party is a prerequisite to a binding written contract." *Id.* Whether a "contract must be signed to be binding is a question of the parties' intent." *Id.* (citing, *inter alia*, *Scaife*, 100 F.3d at 410).

Contrary to Vinmar's assertions, blank signature lines are not proof, by themselves, that the parties required formal signatures for a contract to be binding. In *Scaife*, for example, the blank signature lines hardly stood alone:

> (1) [T]he agreement had signature blocks for the parties to sign; (2) the language in the agreement provided "IN WITNESS WHEREOF, the parties have caused this agreement to be executed by their duly authorized representative at Dallas, Texas, on the first date written above;" (3) one third of the contract price was due "upon the signing of the contract;" (4) the aircraft was to be delivered to the owner within 90 days subject to the execution of the contract; and (5) a clause in the contract stated that no party could alter or amend the contract except in writing signed by both parties.

*Scaife*, 100 F.3d at 410. Furthermore, "Scaife took affirmative steps to ensure

---

[8] (...continued)

("Where 'negotiations' are in writing, the question of whether an offer was unconditionally accepted is primarily a matter of law for the court.").

that a representative would be able to sign the agreement once a finalized contract had been prepared and signed" by the other party. *Id.* at 411. That is to say, Scaife's chief pilot "arranged to travel to [Scaife's attorney's] office . . . to sign the agreement on behalf of Scaife Flight Operations." *Id.* at 408.

Similarly, in *Stanwood Boom Works, LLC v. BP Exploration & Production, Inc.*, 476 F. App'x 572, 575 (5th Cir. 2012), we considered "the full context of the parties' negotiations," not just the blank signature lines. "Stanwood informed BP that Stanwood required BP's signature prior to moving forward, and Stanwood added a signature block for BP. BP never signed it." *Id.* at 573. During negotiations, "BP specifically informed Stanwood that it could not seek authority to enter into the purchase order until after Stanwood signed." *Id.* at 574.

Here, there is no evidence that the parties intended to sign the sales contract before it became a binding addition to their agreement. Vinmar insists that there were blank signature lines on the sales contract, but Tricon presented undisputed testimony that those lines were automatically generated by its computer.[9] Unlike the contract in *Scaife*, which referred to signatures and formal execution multiple times, Tricon's sales contract contained no other references to the need for signatures. Vinmar has not presented any evidence that it discussed the need for signatures with Tricon, unlike the situation in *Stanwood*. Furthermore, whereas Scaife's chief pilot planned to travel to a designated place to sign that contract, Vinmar points to no "affirmative steps" by Tricon to ensure a representative could sign the agreement, except that Tricon owned a fax

---

[9] Vinmar relies on *Coastal Corp. v. Atlantic Richfield Co.*, 852 S.W.2d 714 (Tex. App.—Corpus Christi 1993, no writ), for the proposition that Tricon cannot rely on the sales contract for its arbitration clause while resisting its signature block. *Coastal*, though, involved the sale of securities, which under Texas law "requires a writing indicating that a contract has been made and signed by the party against whom it is sought to be enforced." *Id.* at 717. Furthermore, the provision of that contract was explicit—"Nothing in this Agreement shall be binding upon any of the parties until this Agreement is executed by all of the parties by their duly authorized officers." *Id.* Here, by contrast, the text on the signature block indicated that the sales contract would become "the governing instrument" if it were left unsigned.

machine.

Vinmar's evidence that it did not assent to the arbitration provision is thin. Vinmar contends that a reasonable fact finder could take Vinmar's promise to "revert soon with our purchase order" as evidence that the purchase order, rather than the sales contract, would constitute the agreement. Vinmar offers no evidence of regular practice, industry custom, or communications between the parties to support such an inference, which would be purely speculative.

None of Vinmar's remaining attacks on the district court's reasoning is persuasive. The court accepted Tricon's evidence that it was common in the industry to agree to additional terms without signatures. First, Vinmar argues that some kinds of deals are signed and some are not. The distinction between the two, Vinmar asserts, "is not entirely clear." To the contrary, the portions of the record cited explain the difference precisely—"Unless they're a long-term contract with the company over a period of a year usually, then they're usually never signed," testified Lockwood—and—"On spot deals, I don't recall ever seeing [the signature blocks] signed," recounted Rajevac.

Second, contrary to Vinmar's assertion, the evidence demonstrates that Tricon's practice matched industry practice. Vinmar's counter-example, a "very similar" deal that was signed, was actually a year-long commitment to supply MX monthly.

More fundamentally, Vinmar maintains that the district court erred by confusing agreement to specific terms in the sales contract with assent to enter a binding contract. The problem with Vinmar's argument is that it concedes it entered into a binding contract with Tricon before Tricon sent the sales contract. The parties already agreed on the deal's essential terms—price and quantity—before they ever started discussing additional terms. That places this matter on an entirely different footing from those cases that recognize the right of a party to "structure their negotiations so that they preliminarily agree on certain terms,

yet protect themselves from being prematurely bound in the event they disagree on other terms." *WTG Gas*, 309 S.W.3d at 649.

Signatures lines may be strong evidence that the parties did not intend to be bound by a contract until they signed it. But the blank signature blocks here are insufficient, by themselves, to raise a genuine dispute of material fact. All the remaining evidence—the parties' negotiations, Tricon's past practice, common industry practice, that the blanks were automatically computer generated, and that the parties made a binding deal to trade MX before negotiating over arbitration—conclusively demonstrates that Tricon and Vinmar reached a binding agreement to arbitrate even though they did not sign the contract.[10]

V.

Tricon maintains that the district court erred by awarding postjudgment interest at the default statutory rate, allegedly disregarding the contractual rate awarded by the arbitration panel. Vinmar replies that the panel lacked authority to assign a rate other than the statutory default and did not purport to do otherwise. The district court ruled in Vinmar's favor, because it was unclear whether the panel awarded postjudgment interest at 8.5% and also because "courts have held that 28 U.S.C. § 1961 governs a district court judgment confirming an arbitral award even when the arbitrators awarded postjudgment interest at a different rate." Those courts, however, did not confront the issue Tricon raises, which we have not previously considered—whether arbitrators may award a non-statutory rate if the parties agreed to submit that issue to arbitration. The one circuit that has confronted the question held that the district court had erred by replacing the awarded rate with the statutory default.

---

[10] Because the district court correctly held that the parties did not intend the contract to become binding only when signed, we need not reach Tricon's alternative argument that Pascu and Rajevac signed the document by means of their email signatures.

No. 12-20100

*See Newmont U.S.A. Ltd. v. Ins. Co. of N. Am.*, 615 F.3d 1268, 1275–77 (10th Cir. 2010). We agree with that court; nonetheless, we affirm, because the arbitrators in this case did not award postjudgment interest, but post-award interest, and that distinction makes a difference.

## A.

Federal law governs postjudgment interest in federal cases, including diversity cases. *See Meaux Surface Prot., Inc. v. Fogleman*, 607 F.3d 161, 173 (5th Cir. 2010). Postjudgment interest is not discretionary[11] but "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield[.]" 28 U.S.C. § 1961(a). Despite that mandatory language, it is well-settled that parties may contract for a different rate "consistent with state usury and other applicable laws." *Hymel v. UNC, Inc.*, 994 F.2d 260, 266 (5th Cir. 1993) (internal quotation mark omitted). "But to do so, they must specifically contract around the general rule that a cause of action reduced to judgment merges into the judgment and the contractual interest rate therefore disappears for post-judgment purposes." *Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 794 (10th Cir. 2009).[12]

A judgment confirming an arbitration award—like any other civil judgment—is subject to § 1961.[13] For that reason, Vinmar is correct that there

---

[11] *Meaux Surface Prot.*, 607 F.3d at 173 (citing 28 U.S.C. § 1961(a) ("Interest shall be allowed on any money judgment in a civil case recovered in a district court.")).

[12] *Cf. Kaspar Wire Works, Inc. v. Leco Eng'g & Mach., Inc.*, 575 F.2d 530, 535 (5th Cir. 1978) ("When the plaintiff obtains a judgment in his favor, his claim 'merges' in the judgment; he may seek no further relief on that claim in a separate action.").

[13] *See* 9 U.S.C. § 13 ("The judgment so entered shall have the same force and effect, in all respects, as, and be subject to all the provisions of law relating to, a judgment in an action; and it may be enforced as if it had been rendered in an action in the court in which it is entered."); *see also, e.g.*, *Fid. Fed. Bank , FSB v. Durga Ma Corp.* 387 F.3d 1021, 1023 (9th Cir.
(continued...)

12

is no arbitration exception to the general merger doctrine. Furthermore, the circuits have unanimously agreed that "an arbitration panel may not establish a post-judgment interest rate itself . . . ." *Newmont*, 615 F.3d at 1277.[14]

That principle does not decide this case; if the arbitrators awarded a non-statutory rate, they did so based on the parties' submission of the issue to them, not on their own authority. An arbitration panel "may determine whether the parties have sufficiently contracted for their own rate and, if they have, indicate that rate should be applied." *Id.* Furthermore, the parties may agree to submit the question of postjudgment interest to arbitration.

The merger rule is not absolute; parties can contract for a non-statutory rate of postjudgment interest. If they can contract for an alternative rate directly, there is no reason why they should not be able to do so indirectly by agreeing to submit the question to arbitration.[15] Also, whether the parties agreed to an alternative rate is a question of intent. "The parties' intent is a quintessential fact question, and we see no reason why an arbitration panel with authority to decide a contractual dispute cannot also determine whether the contract in question includes language clearly, unambiguously, and unequivocally stating the parties' intent to bypass § 1961." *Id.* In other words, if parties can submit every other dispute of contract interpretation to arbitration, why make an excep-

---

[13] (...continued)
2004).

[14] *Accord Durga Ma*, 387 F.3d at 1024 ("[O]nce an arbitration award is confirmed in federal court, the rate specified in § 1961 applies. This is the case even if the arbitration award purported to grant post-judgment interest." (internal citation omitted)); *Carte Blanche (Singapore) Pte., Ltd. v. Carte Blanche Int'l, Ltd.*, 888 F.2d 260, 268–70 (2d Cir. 1989); *Parsons & Whittemore Ala. Mach. & Servs. Corp. v. Yeargin Constr. Co.*, 744 F.2d 1482, 1484 (11th Cir. 1984) (applying increase in state statutory rate to award issued at prior rate).

[15] *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . .").

tion for the question whether they intended to contract around § 1961? Finally, insofar as an arbitration panel sets a postjudgment rate as a matter of contract interpretation, its award is entitled to almost absolute deference.[16] In such a case, the district court would be required to enforce the award even if the intent to contract around § 1961 did not seem clear, unambiguous, and unequivocal to the court.[17]

Nothing in the cases cited by Vinmar counsels a different approach. In *Durga Ma*, 387 F.3d at 1022, for example, the arbitration panel stated, "The total amount of this award . . . *shall bear interest at the statutory rate* from [the date of the award]." The panel did not specify a state rate rather than the federal rate and did not distinguish postjudgment from prejudgment interest. *See id.* at 1024. Of more import, there is no indication that the parties in *Durga Ma* submitted the issue of postjudgment interest to arbitration or that the arbitration panel was purportedly interpreting the contract. In *Carte Blanche*, 888 F.2d at 263, the arbitration panel awarded postjudgment interest as part of "a series of injunctive rulings designed to secure an orderly termination of the franchise relationship," not as a matter of contract interpretation.[18]

---

[16] *See Glover v. IBP, Inc.*, 334 F.3d 471, 474 (5th Cir. 2003) ("When an arbitration agreement gives an arbitrator authority to interpret and apply a contract, the arbitrator's construction of that contract must be enforced so long as it is 'rationally inferable from the letter or purpose of the underlying agreement.'" (quoting *Executone Info. Sys., Inc. v. Davis*, 26 F.3d 1314, 1320 (5th Cir.1994))).

[17] *See Executone*, 26 F.3d at 1320 ("We must sustain an arbitration award even if we disagree with the arbitrator's interpretation of the underlying contract as long as the arbitrator's decision 'draws its essence' from the contract." (internal quotation marks and citation omitted)).

[18] *See also Parsons & Whittemore*, 744 F.2d at 1483–84 (recounting that the arbitration panel awarded postjudgment interest at state statutory rate).

No. 12-20100

B.

Tricon and Vinmar submitted the issue of postjudgment interest to arbitration.[19] Their agreement authorized arbitration for "[a]ny and all differences and disputes of whatsoever nature arising out of this Agreement."[20] Also, Tricon specifically asked for "post-judgment interest, as provided by the parties' contract," in its amended specification of claims for arbitration, and in its closing statement, Tricon demanded "post-judgment interest on its damages in the amount of 8.5% per annum." Vinmar disputed Tricon's claim for interest, contending there was "no written agreement or other authority authorizing Tricon's claim for interest." Because the parties agreed to submit the issue of postjudgment interest to arbitration, the arbitration panel had the authority to award a non-statutory rate. The dispositive question is whether it did so.

Parties wishing to contract around the statutory rate must do so using "clear, unambiguous[,] and unequivocal language," otherwise, the contract merely merges into the judgment.[21] When awarding a non-statutory rate, arbitrators must be just as clear and unequivocal.

Tricon contends that the arbitration panel unambiguously awarded a non-statutory rate of postjudgment interest when it granted "post-award interest" to them "at the rate of 8.5% per annum . . . [from] the date of th[e] award, until paid." Vinmar maintains that the panel did not clearly or unequivocally alter the statutory rate, in light of the fact that it granted "post-award" rather than

---

[19] We construe the parties' intentions "generously" to determine whether they agreed to arbitrate a particular issue. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985).

[20] *Cf. Newmont*, 615 F.3d at 1272, 1276 (holding that agreement to arbitrate "any dispute arising out of" contract authorized arbitrator to decide postjudgment interest issues).

[21] *Riebesell*, 586 F.3d at 794; *Westinghouse*, 371 F.3d at 102; *see also Kanawha-Gauley Coal & Coke Co. v. Pittston Minerals Group, Inc.*, Nos. 11-1835, 12-1037, 2012 WL 6622708, at *6 (4th Cir. Dec. 20, 2012) (per curiam) (unpublished); *Jack Henry & Assocs., Inc. v. BSC, Inc.*, 487 F. App'x 246, 260 (6th Cir. 2012).

"postjudgment" interest. Tricon replies that distinguishing post-award from postjudgment interest "elevates form over substance" and is unsupported by authority. Like the district court, we agree with Vinmar.

Courts have not found that parties and arbitration panels clearly, unambiguously, and unequivocally meant to refer to postjudgment interest except where they have expressly referred to postjudgment interest. In *Durga Ma*, 387 F.3d at 1022, 1024, for example, the court held that an arbitration award contained "no language suggesting that *post*-judgment interest is part of the award" where it merely granted "*interest at the statutory rate*" from the date of the award. Similarly, the agreement in *Westinghouse*, 371 F.3d at 102, that "a 15.5 percent interest rate would be added to any arbitration award 'from the date payment was due to the date payment is made'" was insufficient, because it "failed to state that this rate would apply to judgments rendered on that award." By contrast, the arbitration panel in *Newmont*, 615 F.3d at 1273, "provided for pre- and post-judgment interest at the rate of 1.5 percent per month." In *Hymel*, 994 F.2d at 265–66, we noted that the district court had properly granted interest at a non-statutory rate where the parties' contract provided that all unpaid amounts "shall bear interest from maturity until paid, *both before and after judgment*, at the rate of 9% per annum."[22] Because the arbitration panel did not use the words "postjudgment interest," it is far from clear that it meant to award

---

[22] Tricon offers *ITT Diversified Credit Corp. v. Lift & Equipment Service, Inc.(In re Lift & Equipment Service, Inc.)*, 816 F.2d 1013 (5th Cir.), *modified on reh'g*, 819 F.2d 546 (5th Cir. 1987), as a possible instance in which this court applied the contractual rate of interest post-judgment even though the contract did not specify "postjudgment interest." We did not, however, address the precise language of the agreement. *See id.* at 1018. That case cannot stand for the proposition that any contractual rate of interest applies postjudgment, because that would conflict with the merger rule and would have made it unnecessary for the court in *Hymel* to emphasize that the contractual rate of interest applied both before and after judgment.

postjudgment interest.[23]

Nor is it conclusive that the panel awarded interest from the date of the award "until paid," even though, interpreted literally, the award would last beyond the judgment. The court did not consider similar language—that interest on an arbitration award would accrue "from the date payment was due to the date payment is made"—sufficient in *Westinghouse*, 371 F.3d at 102,[24] nor did the court in *Riebesell*, 586 F.3d at 794, in which the parties agreed that the amount due would "accrue interest until payment." Such boilerplate language does not demonstrate that the panel intended to circumvent the merger rule.[25]

Furthermore, the context of the arbitration panel's grant of interest indicates that it did not intend to award postjudgment interest. The panel cited Tricon and Vinmar's contractual interest provision and noted Tricon's entitlement to "pre-award interest" in the "Damages" section of its award. It then awarded attorney's fees, listing in detail what additional fees Tricon would be awarded in the event of further proceedings to confirm or vacate the award, of an appeal of the district court's judgment, of a petition for review of the appeal, or if the petition were granted and Tricon prevailed.

In that section, the panel did not mention interest, as might have been

---

[23] *See also* Steven H. Reisberg & Kristin M. Pauley, *An Arbitrator's Authority to Award Interest on an Award Until "Date of Payment": Problems and Limitations*, 2013 INT'L ARB. L. REV. 25, 29–30 ("To successfully 'contract out' of the statutory post-judgment interest rates, it is therefore critical that the language used specifically refer to the post-judgment period.").

[24] *Cf. also Carte Blanche*, 888 F.2d at 264, 268–70 (holding that arbitral award of 10% interest "to the date or dates of payment" merged into the judgment)

[25] *See also Hosier v. Citigroup Global Markets, Inc.*, 858 F. Supp. 2d 1206, 1210 (D. Colo. 2012) (holding that arbitration award of "post-award interest at 8% 'accruing from the 31st day after service of this award . . . until final payment of the award'" was insufficient to displace federal rate); Reisberg & Pauley, *supra* note 23, at 28 ("In the United States, an arbitral award stating that interest shall accrue 'until the award is paid' at the rate of 8 per cent will be unenforceable with respect to the post-judgment period. Instead, the federal post-judgment interest statute . . . will govern." (internal citations omitted)).

expected if it intended to award postjudgment interest. Instead, it confined its brief discussion of interest to a subsequent section, titled "Post-award interest." Although Tricon asked for postjudgment interest expressly, the panel did not award postjudgment interest expressly. Under the award's residual clause—"All claims not expressly granted are hereby denied"—the arbitrators denied Tricon's request.

Finally, it is important in this context to distinguish post-award from post-judgment interest. The American Arbitration Association's Commercial Arbitration Rule 43(d), which governed this dispute, grants arbitrators the authority to award "interest as such rate and from such date as the arbitrator(s) may deem appropriate." Arbitrators can therefore be expected to grant postaward interest frequently, and it would create confusion to hold that they award postjudgment interest when they write "postaward interest until paid." If an arbitration panel has been granted authority by the parties to award a non-statutory rate of postjudgment interest, and if it wishes to do so, it must expressly award "postjudgment interest." This panel did not.

The judgment is in all respects AFFIRMED.