# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 31, 2023

Lyle W. Cayce
Clerk

_____

No. 22-30271

_____

Chevron TCI, Incorporated,

*Plaintiff—Appellant/Cross-Appellee*,

*versus*

Capitol House Hotel Manager, L.L.C.; The Wilbur Marvin Foundation,

*Defendants—Appellees/Cross-Appellants*.

_____

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:18-CV-776

_____

Before Smith, Higginson, and Willett, *Circuit Judges*.

Per Curiam:[*]

This contractual dispute arises out of a failed joint venture. The parties agreed to restore and operate an old hotel. When the enterprise failed, the investor member decided to recoup its investment from the other member and its guarantor, claiming they breached numerous contractual provisions. Following summary judgment and a bench trial, the district court

_____

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

granted in part and denied in part those claims. Both sides appealed, raising a host of issues. We AFFIRM in part and REMAND in part.

I

As part of a downtown revitalization project in Baton Rouge, Louisiana, Capitol House Hotel Manager, LLC ("Manager") and Wilbur Marvin Foundation ("WMF") (together, the "Defendants"), sought to restore an old, abandoned hotel called the Capitol House Hotel. In 2005, Chevron TCI, Inc. ("CTCI") invested $11,735,693 in the revitalization project. CTCI is a wholly owned subsidiary of Chevron Corporation, and it invests in tax credits and is a pass-through entity for tax purposes.

On December 29, 2005, the parties formalized their joint venture by executing three contracts: (1) a Purchase Agreement, (2) an Operating Agreement, and (3) a Guaranty Agreement. Under these contracts, CTCI would get a 99.9 percent ownership interest in the newly formed Capitol House Hotel Operating Company LLC ("Operator" or "Company"), and Manager would get a 0.1 percent ownership interest along with management duties. WMF would serve as guarantor of Manager's obligations. Additionally, CTCI would get regular payments and the hotel's historic tax credits. The precise contractual language is key to our resolution of this appeal, and to avoid repetition we will reserve reciting the provisions for later. For now, we mention only that the Purchase Agreement gave CTCI a "put" option, meaning CTCI could force Manager to buy all of CTCI's interest at a price of 20 percent of CTCI's capital contribution.

The project was unsuccessful. In 2006, the hotel began operations. But it never turned a profit. Manager resorted to investing its own cash, via loans, to keep the hotel operating. Furthermore, the Internal Revenue Service began to scrutinize the parties' multi-level tax-credit pass-through structure, concerned that CTCI did not look like a bona-fide partner in the

joint venture for purposes of claiming the hotel's historic tax credits. CTCI would spend the next several years disputing this issue with the IRS.

Eventually, the parties decided to sell the hotel. On September 5, 2012, Manager sold the hotel and all of its furniture, fixtures, and equipment to another company. Around the same time, Manager terminated the "Master Lease," which was the lease between the Operator and one of Manager's parent companies. CTCI consented to the sale and to the termination of the Master Lease. Thus, for all practical purposes, the joint venture wrapped up in September 2012.

Even though operations ceased, over the next several years CTCI and Manager amended the Purchase Agreement. Each amendment extended the deadline for CTCI to exercise its put option. WMF signed the amendments as guarantor, too. Most relevant to this appeal, the seventh of these amendments gave CTCI until December 31, 2015, to exercise its put option.

CTCI exercised its put option on November 19, 2015, well before the December 31 deadline. In addition to the $2,347,139 put price, CTCI demanded $2,504,495 in so-called "priority return" payments and "asset management fees." It further demanded a "special tax distribution" of $3,317,517. CTCI also demanded interest. The total amount demanded was $10,554,519. Manager declined to pay the demanded sum. Soon afterward, in January 2016, CTCI settled with the IRS for two thirds of its claimed historic tax credits. Then CTCI sued Manager and WMF.

On August 17, 2018, CTCI filed this breach-of-contract lawsuit against Defendants in Louisiana federal court under the court's diversity jurisdiction. CTCI sought the same relief it demanded in its November 19 letter, along with interest and attorneys' fees and costs.

On May 1, 2020, the parties cross-moved for summary judgment on all claims. On March 29, 2021, the district court ruled on the cross-motions.

The court held that Defendants owe CTCI the put price (because CTCI timely exercised its put option) and a partial asset management fee for 2012 (because the hotel was sold in September 2012, which is partway through the year). The court also held that Defendants did *not* owe CTCI any asset management fees for any other year (because the managed asset, the hotel, was sold partway through 2012). The district court denied summary judgment on the remaining claims, reserving them for trial.

On March 31, 2022, following a three-day bench trial, the district court entered its final judgment. The court held that CTCI was not entitled to priority-return payments (because the hotel never yielded any positive cash flow); that CTCI was entitled to special tax distributions ($2,803,227 plus interest); that CTCI was entitled to attorneys' fees and costs; and that, as guarantor, WMF was required to pay those amounts if Manager could not. However, the district court held that CTCI owed Defendants $3,205 in overpaid asset management fees (for 2012, the year the hotel was sold). Defendants moved to alter the judgment, but the court denied the motion.

## II

Both sides appeal both the summary-judgment order and the bench-trial judgment. "The standard of review on summary judgment is de novo." *Davidson v. Fairchild Controls Corp.*, 882 F.3d 180, 184 (5th Cir. 2018) (italics omitted). Summary judgment is proper if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "After a bench trial, we review a trial court's findings of fact for clear error and its conclusions of law de novo." *Ali v. Stephens*, 822 F.3d 776, 783 (5th Cir. 2016). "Under clear error review, if the trial court's factual findings are plausible in light of the record viewed in its entirety, we must accept them, even though we might have

No. 22-30271

weighed the evidence differently if we had been sitting as a trier of fact." *Id.* (internal quotation marks omitted).

This cross-appeal presents several issues of contract interpretation. Louisiana law controls our review of these issues because the contracts have a Louisiana choice-of-law clause. Under Louisiana law, "[t]he words of a contract must be given their generally prevailing meaning." LA. CIV. CODE art. 2047. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." LA. CIV. CODE art. 2046.

## III

On appeal, CTCI argues that (A) it is owed annual priority-return payments even though the hotel never made any profits; and (B) it is owed annual asset management fees even after the hotel was sold in 2012. Defendants oppose CTCI on these points and, separately, argue that (C) they are not required to pay the put price because CTCI failed to timely exercise its option; (D) they are not required to pay the annual special tax distribution; (E) they are entitled to offsets in amounts previously paid to CTCI; and (F) the district court applied the wrong rate for post-judgment interest.

We address these issues in the above order.

## A

We begin with the priority-return payments. Under the Operating Agreement, Manager is to pay CTCI an annual "Priority Return," which is a dollar figure based on a certain fixed amount of CTCI's initial capital contribution. Critically, however, priority returns are "payable from Cash Flow or Capital Proceeds in the manner set forth in Section 6.2." "Cash Flow" is defined as net positive cash flow (i.e., receipts less expenses). And the term "Capital Proceeds" is defined as anything the Manager gets from

5

the sale or disposition of the hotel's assets. Finally, Section 6.2 of the Operating Agreement is a waterfall provision specifying the order in which any Cash Flow and Capital Proceeds are to be distributed.

The district court correctly concluded that Defendants do not owe priority returns to CTCI. In their contract, the parties linked those payments to the Operator's profitability. As the court found at trial, however, there was no Cash Flow during any of the relevant years. And while there were some Capital Proceeds, such proceeds were not great enough to survive Section 6.2's waterfall provision. In 2012, for instance, Operator had higher-priority debts of nearly $5.5 million, greatly exceeding the $725,000 received from the sale of the hotel. We therefore affirm the court's holding.

We are not persuaded by CTCI's arguments to the contrary. In CTCI's view, priority-return payments are owed on its capital contribution regardless of whether the hotel had net positive cash flow—that is, akin to interest payments.

CTCI stresses that priority returns are merely "*payable* from" Cash Flow and Capital Proceeds. In its view, we must not confuse the contractual *obligation* to pay priority returns with the *source* of the funds used to pay those amounts. According to CTCI, whether priority returns are owed is different from where Defendants get the money to pay CTCI. We are not convinced. For one, as we have explained, the parties expressly linked the priority-return payments to the hotel's profitability. For another, by agreeing to place priority-return payments on a waterfall provision, the parties envisioned that the payments might not be made and arranged their obligations accordingly.

Second, CTCI argues that Manager should have fronted the priority-return payments under another provision called "Unpaid Priority Returns." Under this provision, "if the unpaid Priority Return at the end of any Fiscal Year . . . is greater than $366,293, then the excess amount of unpaid Priority

Return . . . over $366,293 . . . shall be advanced by [Manager] as a Project Expense Loan and immediately distributed to [CTCI]." In other words, CTCI argues that Manager was supposed to pay CTCI the priority-return payment from its own coffers and then seek any recoupment from Operator—a loan—so that CTCI can get paid regardless of the hotel's profitability, with Defendants assuming the risk of not being paid if the hotel fails to generate positive cash flows. Again, however, we are not persuaded. The record shows that CTCI's claimed priority returns were around $352,000 annually, which is less than $366,293. Thus, the "Unpaid Priority Returns" provision is inapplicable. CTCI resists this conclusion, asserting that the unpaid priority returns are supposed to *accumulate* year over year, thus greatly exceeding $366,293 by the second year and triggering Manager's obligation to pay CTCI using a loan. But that is not what the contract says.

Therefore, we affirm the district court's conclusion that Defendants are not liable for CTCI's claimed priority-return payments.

B

We turn next to the asset management fees and affirm here, too. At trial, CTCI's counsel stated, "Chevron has gone back and examined the financial records. And, in fact, no asset management fees are owed. And we discovered that the Defendants are even entitled to a small credit of $3,205." And in its proposed findings of fact to the trial court, CTCI again submitted, "Defendants are entitled to a credit of $3,205 for Asset Management Fees." Based on these admissions, the district court did not err in finding that Defendants do not owe Chevron asset management fees.

No. 22-30271

Having wrapped up CTCI's appeal, we turn to the cross-appeal.[1]

C

The next issue is whether CTCI is entitled to the put price. This issue turns solely on whether CTCI timely exercised its put option. It did. The seventh amendment to the Amended and Restated Purchase Agreement stated, "The Put may be exercised by [CTCI] at any time prior to December 31, 2015." CTCI exercised the put option on November 19, 2015. We thus conclude, as the district court did, that CTCI is entitled to the put price.

Defendants try to get around this straightforward analysis by arguing that the put option expired upon the sale of the hotel in September 2012. According to them, an earlier amendment to the Purchase Agreement provided that CTCI could exercise the put "at any time prior to October 1, 2012 (or, if earlier, the date of dissolution of the Company)." Defendants say that, under the Operating Agreement, the Company "dissolved" when the Master Lease was terminated and all of the hotel's assets were sold off. Be that as it may, the parties agreed—on five separate occasions *after* the sale of the hotel—to extend the period in which CTCI could exercise the put option. When CTCI finally exercised its put option, it did so within the contracted-for period.

Defendants contend CTCI should be estopped from recovering the put price because CTCI told the IRS that the company had dissolved. But the parties agreed *after* the alleged dissolution to give CTCI the right to exercise the put option at a later date. We thus decline to apply estoppel.

---

[1] We have considered CTCI's remaining arguments, including its position that WMF is not entitled to Manager's contractual defenses, and find them unavailing.

No. 22-30271

Defendants also protest that they didn't expect CTCI would *actually* enforce the extended put option against them; they thought they were just helping CTCI "look like a partnership for the IRS" proceedings. But Louisiana law requires contracts to be enforced when the language is plain, regardless of the parties' intent. La. Civ. Code art. 2046.

Finally, Defendants argue that the amendments are null for violation of public policy and barred by the clean-hands doctrine, because CTCI was trying to use the extensions as part of a strategy to mislead the IRS. But even though Louisiana bars enforcement of contracts where "the object of a contract is illicit or immoral," La. Civ. Code art. 2030, Defendants have not pointed to any illicit or immoral object. No party claims to have conspired to defraud the IRS. All that Defendants claim is that the amendments were "made for a different purpose than extending the Put Option period." But that is not, in and of itself, illicit or immoral. And Defendants point to no authority saying that extending a put option is immoral under Louisiana law.

For these reasons, we agree with the district court that CTCI timely exercised its put option. CTCI is therefore entitled to the put price.

D

The next issue is CTCI's entitlement to the special tax distribution. Section 6.2.C of the Operating Agreement says that, for any fiscal year in which the Operator generates "Profits, Cash Flow or Capital Proceeds," Defendants must pay CTCI an amount equal to "the Profits allocable to [CTCI]" and "the Applicable Tax Rate." Applicable Tax Rate is defined as "the combined effective federal, state, and local income tax rate applicable to [CTCI]" for the year in question.

No. 22-30271

At trial, based on documentary evidence, the district court found that the amount of "Profits" allocable to CTCI for year 2012 was $4,311,144.[2] The court also found, based on the evidence before it, that CTCI's combined federal, state, and local income-tax rate was 38 percent. Following the Operating Agreement, the district court then multiplied these figures and awarded the product as damages.

Most of Defendants' arguments challenging this straightforward analysis are unpersuasive. We dispatch them before explaining why we must nevertheless vacate and remand the district court's judgment on this issue.

First, Defendants argue that CTCI failed to inform them of its applicable tax rate for 2012 in a timely fashion and thus failed to satisfy a condition precedent for receiving a special tax distribution for that year. But while it is undisputed that CTCI failed to timely inform Manager of its applicable tax rate, the only consequence of that failure is that "the Applicable Tax Rate for the previous Fiscal Year shall remain in effect." In other words, the provision is not a condition precedent.

Second, Defendants argue that CTCI didn't make any *profits* in 2012 but instead made a $6.7 million *loss*, so there should be no taxable income against which to multiply the 38 percent. Although the trial court did hear some testimony in support of this point, the court ultimately determined, based on the evidence before it, that Operator had in fact *allocated* a profit to CTCI. The court's determination was not clearly erroneous because it was supported by Operator's documentary evidence. The court was not required to believe Defendants' witness in support of its contrary position.

---

[2] The trial court calculated the tax figure based on "Profits," not "Cash Flow" or "Capital Proceeds," all of which are separately defined terms.

No. 22-30271

Third, Defendants argue that Louisiana law precludes any payment of special tax distributions in 2012 because Operator was insolvent in 2012. Under Louisiana law, LLCs cannot make distributions to members if that would render the LLC insolvent or if the LLC is dissolved. LA. REV. STAT. §§ 12:1324(A) & 12:1327(A). Defendants contend these two statutory provisions bar the payment of any special tax distributions in 2012, as the hotel was sold that year as a result of its insolvency. But this argument is forfeited because it was raised for the first time in Defendants' post-trial motion to alter the judgment. *See Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990) (defenses raised for the first time in post-trial motions are generally forfeited). Even if the argument were not forfeited, we would reject it because the parties contracted around the Louisiana law. The contract is clear about what is to happen if the LLC, Operator, "has insufficient cash to make" a special tax distribution: "[Manager] shall advance the amount of the deficiency to [the LLC] as a" loan.

Finally, Defendants argue that the trial court erred by using Chevron Corporation's tax rate instead of CTCI's tax rate and that CTCI doesn't have any effective tax rate whatsoever because it is a pass-through entity. But the trial court found, based on testimony it found credible, that CTCI's (not Chevron's) combined federal, state, and local income-tax rate was 38 percent. And it used CTCI's (again, not Chevron's) tax rate to calculate the special tax distribution. Further, Defendants' pass-through theory is unpersuasive because it would mean special tax distributions are never owed under the parties' contract, as any number (such as profits) multiplied by zero (CTCI's tax rate according to Defendants' pass-through theory) is always zero.

Nevertheless, we discern clear error in the trial court's calculation of the applicable tax rate. Defendants point out that 38 percent was Chevron's *marginal* tax rate, not its *effective* tax rate. Under the Operating Agreement,

11

however, the special tax distribution is to be calculated using "the combined *effective* federal, state, and local income tax rate applicable to [CTCI]" for the year in question. Our independent review of the record reveals that the 38 percent figure was based on evidence of Chevron's marginal tax rate, not its effective tax rate, and that trial evidence on Chevron's effective tax rate suggested 27.85 percent instead. During oral argument, CTCI's counsel confirmed these points, and we commend counsel for his forthrightness on the matter. Because the 38 percent figure was based on evidence concerning Chevron's marginal tax rate, the district court's calculation was premised on clear error.

We thus affirm the district court's conclusion that Defendants owe CTCI the special tax distribution, but we nonetheless remand for the court to recalculate the amount owed using the correct applicable tax rate.

E

Next, Defendants argue that they are entitled to a setoff for damages awarded to CTCI for overpayments they claim they made with respect to (1) priority-return payments, (2) the put price, and (3) asset management fees. We agree with Defendants only as to the first item.

1

As discussed above, the district court rightly held that Defendants do not owe priority-return payments. But the record reflects that Defendants made priority-return payments to CTCI for 2008 and 2009 anyway. Under Louisiana law, Defendants are entitled to a setoff for the amounts they overpaid. *See LSREF2 Baron, LLC v. Tauch*, 751 F.3d 394, 399 (5th Cir. 2014). Because the district court did not apply the setoff, we remand for the court to do so.

CTCI argues that the setoff should not be allowed because Defendants failed to raise setoff as an affirmative defense in the pleadings.[3] After all, we have held that setoff under Louisiana law is an affirmative defense that must be timely raised or else it is subject to forfeiture. *Id.* While not contesting these points, Defendants insist that they fairly and timely raised a setoff claim in their pretrial order, at trial, and in their post-trial proposed findings of fact and conclusions of law.

While it is always preferable to assert an affirmative defense in one's responsive pleadings, we agree with Defendants that their setoff claim is not forfeited. "Unfair surprise and prejudice are central concerns underlying the requirement that a defendant timely plead affirmative defenses." *Id.* at 402. Whether setoff under Louisiana law may be raised late in litigation turns on whether "it was raised at a 'pragmatically sufficient time' and did not prejudice the plaintiff in its ability to respond." *Id.* at 398 (citation omitted). We have held, for instance, that an affirmative defense was not forfeited where it was raised for the first time in a "trial brief and proposed findings of fact and conclusions of law," because the defense in question was purely "a legal issue 'without the need for factual proof.'" *Lee v. United States*, 765 F.3d 521, 525 (5th Cir. 2014). Prejudice, of course, is the critical consideration. In *Tauch*, we affirmed the trial court's refusal to permit the defendant to raise a Louisiana setoff defense for the first time at the summary-judgment stage because proving entitlement to setoff "would require proof of additional facts beyond the face of the complaint." 751 F.3d

---

[3] CTCI also argues that a setoff is not warranted because, in its view, it is entitled to the priority-return payments from Defendants. Because we have already rejected this argument, we do not repeat ourselves here. CTCI further contends that a setoff is unwarranted because WMF, as guarantor, must pay the full amount anyway under the terms of the governing agreements. But the contractual provisions CTCI cites do not support its contention.

at 402; *see also Lucas v. United States*, 807 F.2d 414, 418 (5th Cir. 1986) (defense of statutory cap on damages not forfeited, though raised for the first time at trial, because it was "purely a legal issue which can be resolved without the need for factual proof," resulting in no prejudice to the opposing party at trial); *Ingraham v. United States*, 808 F.2d 1075, 1079 (5th Cir. 1987) (defense forfeited due to prejudice because the opposing party "would have made greater efforts" to prove damages at trial had the defense been raised earlier).

In this case, Defendants asserted in the joint pretrial order that they "mistakenly paid CTCI" priority-return payments even though none were owed. *See Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 604 (5th Cir. 2000) ("It is a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial." (internal quotation marks and citation omitted)). And during the bench trial, Defendants' expert witness testified that CTCI owes Defendants for the overpaid priority returns. Finally, in their post-trial proposed findings of fact and conclusions of law, Defendants claimed entitlement to a setoff on the ground that "Operator overpaid CTCI Priority Returns for the years of 2008 and 2009 when Priority Returns were not due." CTCI has not shown prejudice or unfair surprise, nor does CTCI claim that the expert's calculations are incorrect. Under these circumstances, we hold that Defendants did not forfeit their right to a setoff defense. *See Lee*, 765 F.3d at 525.

Accordingly, we vacate and remand this issue so that the district court may apply the setoff to CTCI's damages award.

2

Defendants next argue that they are entitled to setoff damages, at least as to the put price, because Operator used the money it obtained from selling

the hotel to pay the fees of professionals involved in the IRS audit. In Defendants' view, they made these payments for CTCI's benefit, at CTCI's request, and "in lieu of a Put payment."

We disagree. Defendants have not shown that CTCI agreed to accept payment of the professionals' fees *in lieu of* the put price. In fact, Defendants conceded at trial that Operator, not CTCI, was responsible for paying these fees. This concession was correct, for under the terms of the Operating Agreement, Operator is liable for the costs of contesting any "determination by the IRS with respect to a Company tax item." Because the IRS audit concerned the tax structure for the joint venture and the Operator's receipt of historic tax credits, Operator was on the hook for paying the fees associated with that contest.

Therefore, a setoff on this ground is not warranted.

### 3

As a last claimed setoff item, Defendants argue that they are entitled to 12 percent compounded interest on the $3,205 that CTCI owes them as a result of their overpayment of asset management fees in 2012. But unlike their claim to a setoff based on overpaid priority returns, Defendants do not appear to have timely raised this issue to the trial court at all. We therefore hold that this argument is forfeited. *See Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021).

### F

Finally, Defendants argue that the district court erred in calculating the post-judgment interest rate. The court awarded the contractual interest rate instead of the federal post-judgment interest rate.

Defendants are right. In diversity cases, the federal post-judgment interest rate applies. *Chapman & Cole v. Itel Container Int'l B.V.*, 865 F.2d

676, 689–90 (5th Cir. 1989); *see* 28 U.S.C. § 1961(a). Parties can agree to a different rate, but they "must do so using clear, unambiguous, and unequivocal language." *Tricon Energy Ltd. v. Vinmar Int'l, Ltd.*, 718 F.3d 448, 458 (5th Cir. 2013) (alteration adopted) (internal quotation marks omitted). "Courts have not found that parties … clearly, unambiguously, and unequivocally meant to refer to postjudgment interest except where they have expressly referred to postjudgment interest." *Id.* at 459.

The parties did not contract around the federal rate. According to the relevant governing agreements, put-price interest accrues at a certain rate "through the date of payment of the Put Price," and interest on special tax distributions accrues at 12 percent, compounded annually, "until paid." But this language is insufficient to negate the federal rate. First, there was no "express[] refer[ence] to postjudgment interest." *Tricon Energy*, 718 F.3d at 459. Second, and more importantly, we have rejected "boilerplate language" virtually identical to the provisions at issue here. *Id.* at 460. In *Tricon Energy*, we held that the phrase "until paid" was insufficient "even though, interpreted literally, the award would last beyond the judgment." *Id.* at 459. We further noted that the phrase "to the date payment is made" is similarly insufficient. *Id.* at 459–60.

CTCI's only argument in response is that Defendants forfeited this argument by raising it for the first time on appeal. But we have held that a party's failure to brief its entitlement to post-judgment interest constitutes "oversight, not waiver." *Meaux Surface Protection, Inc. v. Fogleman*, 607 F.3d 161, 173 (5th Cir. 2010) (citation omitted). "Post-judgment interest is awarded as a matter of course," so "[t]he matter is not discretionary." *Id.* We therefore vacate that portion of the court's order and remand for the court to apply the federal post-judgment interest rate. *See id.*; *Hall v. White, Getgey, Meyer Co., LPA*, 465 F.3d 587, 594 (5th Cir. 2006) ("The post-

No. 22-30271

judgment interest rate for judgments in federal courts is governed by federal statute, 28 U.S.C. § 1961(a). On remand, that statute should be applied.").

We hold that the parties did not contract around the federal interest rate and that the federal rate applies.[4]

IV

In sum, the judgment of the court is AFFIRMED, except that we:

- VACATE and REMAND for the district court to recalculate the special tax distribution using the correct applicable tax rate.
- VACATE and REMAND for the district court to apply the setoff for Defendants' overpaid priority returns for 2008 and 2009; and
- REVERSE and REMAND for the district court to apply the federal post-judgment interest rate.

─────────────────────────────

[4] We have considered Defendants' remaining arguments, including their claims about CTCI's "misconduct" and WMF's entitlement to extra-contractual defenses, and find them unavailing.

17